IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ARTHUR JACOB BRASS | § | Chapter 7 |
| DEBTOR | § | CASE NO.   21-60025 |
| | § | |
| VITOL INC. | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| ARTHUR JACOB BRASS | § | |
| | § | ADVERSARY NO.  21-06006 |
| Defendant. | § | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Arthur J. Brass ("**Debtor**") moves under Rule 7056 of the Federal Rules of Bankruptcy Procedure for an order granting summary judgment against Vitol, Inc. ("**Vitol**"), and would respectfully show the Court as follows:

<u>**SUMMARY OF FACTS AND RELIEF REQUESTED**</u>

In 2017, GCAC negotiated a profit-sharing joint marketing agreement with Vitol (the, "**Agreement**"). Arthur Brass (the, "**Debtor**") was the president of GCAC at that time. After the terms of the Agreement were finalized and drafted, Vitol realized that it had previously executed a non-compete agreement with another company (Valt) that prevented Vitol from executing the Agreement with GCAC.

As a result of the non-compete, Vitol refused to execute the Agreement with GCAC, but nevertheless continued to do business with GCAC. The "relationship" soured and GCAC sued Vitol. In response, Vitol filed counterclaims against the Debtor and GCAC, alleging that Vitol was "a lender" who was owed millions of dollars, even though 1) no funds were provided by Vitol to GCAC per any loan agreement, and 2) Vitol and GCAC never executed a written financing or loan agreement.

After protracted litigation, the Debtor was unable to financially and emotionally continue to fight Vitol, a billion-dollar company with endless resources to pay for a team of lawyers. So, the Debtor entered into a settlement agreement with Vitol where Vitol released and fully discharged all of its claims against the Debtor (specifically including fraud claims), in exchange for the Debtor executing a voluntary Agreed Final Judgment for $10 million.

The Debtor was unable to financially perform under the settlement agreement and was left with no choice but to file a Chapter 7 bankruptcy case. As expected, Vitol filed an Adversary Proceeding objecting the dischargeability of its debt (the, "**Adversary**"). In the Adversary, Vitol alleges that it "loaned" GCAC millions of dollars and that these funds were obtained by the Debtor via his fraudulent acts.

The Debtor files this Motion for Summary Judgment and asserts that Vitol is barred from objecting to the dischargeability of the debt for acts that occurred prior to the execution of the Final Settlement Agreement as all of Vitol's fraud claims against the Debtor were released and forever discharged. The only debt that the Court should determine to be non-dischargeable is the debt that arose when the Debtor failed to pay under the terms of the Final Settlement Agreement. Failure to pay the Settlement Agreement is nothing more than a breach of contract that is clearly dischargeable in a Chapter 7 case.

The United States Supreme Court addressed this very issue in the *Archer*[1] case which stands for the proposition that a Bankruptcy Court can examine the released original debt and the

---

[1] *Archer v. Warner*, 538 U.S. 314 (2003)

**MOTION FOR SUMMARY JUDGMENT**                                                                 **Page - 2**

underlying facts to determine whether a debt is dischargeable, even when the claims have been released in a settlement agreement. However, the Supreme Court in *Archer* specifically noted that what had not been established by the Parties in *Archer* and what the lower court should determine is whether **"the parties meant to resolve the issue of fraud, or more narrowly, to resolve that issue for purposes of a later claim of nondischargeability in bankruptcy".**

If this Court determines that Vitol and GCAC did not resolve the fraud claims in their settlement agreement, then this Court must start from the beginning and determine whether Vitol's underlying allegations of fraud are true. Here, Vitol has specifically alleged that Vitol "loaned" GCAC millions of dollars and that this "debt" is non-dischargeable based on Mr. Brass's alleged fraudulent acts. Therefore, before this Court can determine the Debtor's alleged "bad acts", Vitol must first establish that it loaned GCAC money. It is uncontroverted that there is no executed loan agreement between Vitol, GCAC and the Debtor.

Therefore, the statute of frauds prohibits the introduction of any evidence regarding an alleged loan between Vitol and GCAC. Section 26.02(b) of the Business and Commerce Code specifically provides that a loan agreement is <u>unenforceable</u> unless the agreement is in <u>writing</u> and <u>signed</u> by the party to be bound. If there is no evidence that a loan existed, then there can be no ruling that a loan was obtained by fraud. In addition, it is undisputed that Vitol never advanced any funds to the Debtor or to GCAC pursuant to a written loan agreement. No debt, there is nothing to find nondischargeable.

Therefore, the Debtor respectfully requests that this Court grants summary judgment in favor of the Debtor and denies all the relief requested in Vitol's Dischargeability Complaint.

## THE SUMMARY JUDGMENT EVIDENCE

The Debtor's *Motion for Summary Judgment* is based upon the following evidence:

| EXHIBIT # | DOCUMENT |
|---|---|
| 1 | Vitol's First Amended Complaint |
| 2 | Settlement Agreement |
| 3 | Debtor's RFA sent to Vitol |
| 4 | Vitol's Responses to Debtor's RFA |
| 5 | Agreed Judgment attached to Vitol's POC |
| 6 | Debtor's Sworn Affidavit |
| 7 | Vitol's Amended Responses to Debtor's Request for Production |
| 8 | Vitol's Amended Responses to Debtor's Interrogatories |
| 9 | Alleged Financing Agreement (the, **"Email"**) |
| 10 | $1.2 million check rejected by Vitol |

## STATEMENT OF UNDISPUTED FACTS

### RELATIONSHIP BETWEEN THE PARTIES

1. Arthur Brass ("**Debto**r" or "**Brass**") was the president of GCAC.[2]

2. Brass does not have a direct ownership interest in GCAC, but owns a 50% interest in Trifinery, Inc ("**Trifinery**"), which owns GCAC.[3]

3. Vitol and Brass entered into discussions about entering into a profit-sharing joint marketing agreement to buy and sell asphalt between Vitol and a to-be-created entity ("**Marketing Agreement**").[4]  (Vitol and GCAC are referred to as the "**Parties**").

4. The Marketing Agreement was never executed by the Parties.[5]

5. Neither the Debtor, nor GCAC executed a partnership agreement with Vitol.[6]

6. Neither the Debtor nor GCAC were ever employees of Vitol.[7]

7. Without any written and signed agreements between the Parties, the Parties continued to do business.

---

[2] Exhibit 1 – Amended Complaint, Page 2, Paragraph 6
[3] Exhibit 1 – Amended Complaint, Page 2, Paragraph 6
[4] Exhibit 1 – Amended Complaint, Page 2, Paragraph 7
[5] Exhibit 1 – Amended Complaint, Page 2, Paragraph 7
[6] Exhibit 4 – Vitol's Responses to Debtor's RFA (RFA#29 and #30)
[7] Exhibit 4 – Vitol's Responses to Debtor's RFA(RFA#33-36)

**LAWSUIT FILED**

8. A dispute arose between the Parties and in May, 2018, GCAC sued Vitol for its failure to comply with promises made in the unexecuted Marketing Agreement (the, "**Lawsuit**").[8]

9. Vitol filed counterclaims in the Lawsuit against both GCAC and the Debtor for over $14 million claiming that Vitol "loaned" GCAC over $14 million pursuant to an Interim Financing Agreement, and that the Debtor and GCAC were liable for fraud, conversion, and fraudulent transfers.[9]

10. However, neither GCAC nor the Debtor ever entered into a written Interim Financing Agreement with Vitol for a single dollar. In response to the Debtor's written discovery [10]requesting a copy of the alleged Interim Financing Agreement, Vitol produced one document - an email from Mr. Brass which is attached as Exhibit 9 ("**The Email**").

11. The Email was not signed by either Brass, GCAC or Vitol.[11]

    a. The Email does not contain any promises by GCAC or the Debtor to borrow money or obtain credit from Vitol.

    b. The Email does not include an acceptance by Vitol to loan or provide credit to GCAC or Vitol.

    c. The Email does not contain an interest rate.

    d. The Email does not contain terms.

    e. The Email does not contain dollar amounts.

    f. The Email that Vitol is relying on as the "Financing Agreement" merely states, "this is **roughly** what we are **thinking** for interim. Let's talk in the AM" (emphasis added).

12. In response to written discovery from the Debtor, requesting a breakdown of what Vitol provided GCAC, Vitol does not state that they provided GCAC with any money, but instead responds that Vitol provided GCAC with "*product purchases, hedging services/purchases, deal costs, storage and transportation costs, and other associated fees and costs while also assuming the credit risk.*" – Not Money.[12]

---

[8] Exhibit 1 – Amended Complaint, Page 4, Paragraph 12.
[9] Exhibit 1 – Amended Complaint, Page 4, Paragraph 12.
[10] Exhibit 7 – Vitol's Responses to RFP #4 and #5 (references GCAC004694-GCAC004695); and Exhibit 9 (references GCAC004694-GCAC004695)
[11] Exhibit 9 – Email (GCAC004694-GCAC004695)
[12] Exhibit 8 – Vitol's Responses to Interrogatories - #1, #2, #3 and #4

13. In summary, GCAC and Vitol were both working toward the same goal of buying and selling asphalt. In fact, Vitol admits in its written discovery responses that Vitol received over $16 million from GCAC during their business relationship.[13]

**SETTLEMENT REACHED**

14. Brass eventually decided to settle the Lawsuit as he was never going to be able to financially sustain a fight against Vitol, a billion-dollar company with unlimited resources and access to teams of attorneys.[14]

15. On November 5, 2020 and prior to trial of any of the pending claims, the Debtor and GCAC entered into a settlement agreement with Vitol ("**Settlement Agreement**").[15]

16. Pursuant to the Settlement Agreement, all of Vitol's claims against Brass and GCAC for damages that arose out of or were related to the allegations contained in the Lawsuit (including but not limited to fraud, defamation, intentional misrepresentation, breach of duties of good faith and fair dealing) were released and forever discharged ("**Released Fraud Claims**").[16]

17. The Parties to the Settlement Agreement agreed to the following:
    a. Any claims that <u>could have been</u> asserted in the Lawsuit are included in the Released Fraud Claims. [17]
    b. The Debtor was **released, held harmless and forever "discharged"** from all claims including fraud, intentional misrepresentations, and breach of implied duties of good faith and fair dealing.[18]
    c. The Settlement Agreement specifically states that no party relied on any representations other than those contained in this agreement, and that the Settlement Agreement contains the entire agreement between the Parties.**[19]**

18. As part of the Settlement Agreement, in consideration for the Released Fraud Claims, the Debtor executed an Agreed Final Judgment in the amount of $10 million. [20]

---

[13] Exhibit 8 – Vitol's Responses to Interrogatory #1
[14] Exhibit 6 – Brass' Affidavit
[15] Exhibit 2 (Settlement Agreement) and Exhibit 3 (RFA #1 and #2), Exhibit 4 (Responses to RFA#1 and #2)
[16] Exhibit 2 (Settlement Agreement, Paragraph 4(defines the Released Claims)
[17] Exhibit 2 (Settlement Agreement, Page 2, Paragraph 1)
[18] Exhibit 2 (Settlement Agreement, Page 2, Paragraph 4)
[19] Exhibit 2 (Settlement Agreement, Page 3, Paragraph 1)
[20] Exhibit 4 (RFA Response #39)

19. As evidenced by the clear language contained in the Settlement Agreement, the Debtor and Vitol intended that the settlement agreement specifically released and forever discharged the Debtor from the Released Fraud Claims.

20. Vitol, a billion-dollar company and the largest oil trading company in the United States, was not only represented by sophisticated counsel, but agreed in the Settlement Agreement that:

    a. Vitol had the opportunity to consult with counsel[21]; and
    b. Vitol fully informed themselves of the terms and conditions found in the Settlement Agreement after having been afforded the opportunity to consult with counsel of their choosing.[22]

**AGREED FINAL JUDGMENT**

21. The Debtor was unable to pay per the terms of the Settlement Agreement, and Vitol filed the Agreed Final Judgment in the District Court of Harris County, Texas.[23]

22. On November 20, 2020, Vitol obtained an Agreed Final Judgment against the Debtor which awarded Vitol damaged in the amount of $10 million. [24]

23. Neither the Settlement Agreement nor the Agreed Final Judgment indicated that the Debtor's liability to Vitol was based on fraud.[25]

24. Subsequently, Vitol sought to have a receiver appointed over the Debtor.[26]

**BANKRUPTCY FILED AND DISCHARGEABILITY COMPLAINT FILED**

25. On March 26, 2021, the Debtor filed his Chapter 7 case.[27]

26. On March 26, 2021, GCAC also filed a Chapter 7 bankruptcy case.[28]

27. Prior to filing his Chapter 7 case, the Debtor offered to turnover approximately $1.2 million to Vitol, but Vitol rejected the money. [29]

---

[21] Exhibit 2 (Settlement Agreement, Page 3, Paragraph 3)
[22] Exhibit 2 (Settlement Agreement, Page 3, Paragraph 3)
[23] Exhibit 4 (Vitol's Response to RFA #40)
[24] Exhibit 1 (Amended Complaint, Page 5, Paragraph 14)
[25] Exhibit 2 (Settlement Agreement) and Exhibit 5 (Agreed Judgment attached at Page 6 to Vitol's POC)
[26] Exhibit 4 (RFA Response #41)
[27] Exhibit 2 (Complaint, Paragraph 20, Page 6)
[28] Exhibit 1 (Amended Complaint, Paragraph 20)
[29] Exhibit 10 (Check offered to Vitol) and Exhibit 6 (Declaration)

28. On July 7, 2021, Vitol filed a Proof of Claim in the amount of $10,184,049.77, and specifically asserted that the proof of claim arises from the Agreed Final Judgment, not from the amount allegedly owed and plead in the underlying Lawsuit.[30]

29. On July 9, 2021, Vitol filed an Adversary Proceeding against the Debtor and subsequently amended its Complaint on October 6, 2021 ("**Amended Complaint**").[31]

## ALLEGATIONS IN VITOL'S COMPLAINT

30. Vitol pleads three causes of action in the Amended Complaint ("**Causes of Action**"):

    a. Count 1: Non-dischargeability of the debt pursuant to 11 U.S.C. §523(a)(2)(a);

    b. Count 2: Non-dischargeability of the debt pursuant to 11 U.S.C. §523(a)(4); and

    c. Count 3: Non-dischargeability of the debt pursuant to 11 U.S.C. §523(a)(6).

## ARGUMENT

### SUMMARY JUDGMENT - FIRST BASIS: NOVATION

31. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Bankr. P.* 7056.

32. The Debtor asks this Court to grant summary judgment based on the legal concept of novation. Novation is the substitution of a new agreement between the same parties. Where a novation occurs, only the new agreement may be enforced. *Honeycutt v. Billingsley,* 992 S.W.2d 570, 576 (Tex. App.—Houston [1st Dist.] 1999, pet. Denied).

33. Here, the Settlement Agreement is a novation because it completely substituted the earlier alleged tort debt with a new contractual obligation (*i.e.* The Settlement Agreement). When the Debtor breached the Settlement Agreement, Vitol no longer had the option to seek enforcement of the alleged tort debt as the prior obligation no longer existed.

34. Under the terms of novation, Vitol's only remedy was limited to the enforcement of the Settlement Agreement. Vitol understood this concept as evidenced by Vitol's proof of claim where they only seek to recover the amounts owed under the Settlement Agreement, not the amounts claimed by Vitol in the underlying Lawsuit.

---

[30] Exhibit 5 (Vitol's POC and attached Agreed Judgment)
[31] Exhibit 1 – Amended Complaint

### U.S. Supreme Court Opinion

35. In *Archer v. Warner*[32], the United States Supreme Court addressed a fact situation that is similar to this case, but has one significant distinction. In *Archer*, the Warners sold their manufacturing business to the Archers, and a few years later the Archers sued the Warners for fraudulent misrepresentations during the sale. Before trial, the parties executed a settlement agreement which provided that the Warners would give the Archers cash and a promissory note in exchange for a "general and mutual release" of all claims. The Warners defaulted and then filed a Chapter 7 bankruptcy case. The Archers objected to the dischargeability of the debt and claimed that the debt was non-dischargeable because the underlying claims of fraud would not have been dischargeable in bankruptcy. The Fourth Circuit disagreed with the Archers, affirming the result of both the district court and the bankruptcy court who concluded that the releases and the settlement agreement created a novation, substituting a dischargeable contract debt for a fraud-based tort claim.

36. The Supreme Court reversed.

37. *Archer* stands for the proposition that a Bankruptcy Court may examine the released original debt and the underlying facts to determine whether a debt is dischargeable, even when the claims have been released in a settlement agreement.

38. However, the Supreme Court in *Archer* specifically noted that what had not been established by the Parties in *Archer* is whether **"the parties meant to resolve the issue of fraud, or more narrowly, to resolve that issue for purposes of a later claim of nondischargeability in bankruptcy".**

39. In *Archer,* the Supreme Court specifically left the door open and remanded the issue of whether the parties intended their settlement agreement to have issue and claim-preclusive effect, and to what extent such preclusion applies to enforcements of a debt specifically excepted from the releases contained in a settlement agreement.

40. The door left open by the Supreme Court is the exact situation where the Debtor finds himself in this case. Mr. Brass and Vitol were both represented by sophisticated legal counsel who drafted a settlement agreement that specifically released and discharged all of Vitol's fraud claims in exchange for the execution of an Agreed Final Judgment for $10 million.

---

[32] *Archer v. Warner*, 538 U.S. 314 (2003)

41. Here, a novation occurred, and only the new agreement *(i.e.* Settlement Agreement) can be enforced. Therefore, the Debtor respectfully requests that this Court enters summary judgment in his favor for all three causes of action plead in Vitol's Amended Complaint.

**FIDUCIARY DUTY: SECTION 523(a)(4)**

42. In addition to the arguments raised above related to novation, the Court should also grant summary judgment in the Debtor's favor as it relates to Court Two of the Amended Complaint that seeks a determination of non-dischargeability under Section 523(a)(4).

43. In order for Vitol to prevail under Section 523(a)(4), Vitol must first show that the Debtor owed Vitol a fiduciary duty.

44. Here, Vitol affirmatively and repeatedly alleges that Vitol was GCAC's lender.[33]

45. It is well settled Texas law that the relationship between a borrower and its lender is neither a fiduciary relationship, nor a special relationship. *Victoria Bank & Trust Co. v. Brady,* 779 S.W.2d 893, 902 (Tex.App.— Corpus Christi 1989, *affd in part, rev'd on other grounds,* 811 S.W.2d 931 (Tex.1991).

46. Vitol cannot have it both ways. On one hand, Vitol refuses to allege that it had a joint venture with GCAC as this would expose Vitol to litigation with Valt – a company with whom Vitol executed a non-compete. Instead, Vitol claims that it was merely GCAC's lender *via* the alleged Interim Financing Email. Therefore, if Vitol's allegations are taken as true, then no fiduciary relationship could have existed between GCAC, Brass and Vitol, and any claims under Section 523(a)(4) should be denied as a borrower and a lender do not have a fiduciary relationship.

**ALTERNATE GROUNDS FOR SUMMARY JUDGMENT**

47. Alternatively, if the Court denies summary judgment based on the novation argument, and instead decides to look "behind" the settlement agreement to focus on the underlying facts and allegations, then the Debtor asks this Court to grant summary judgment based on the Statue of Frauds.

48. In its Amended Complaint, Vitol alleges that 1) it "loaned" GCAC millions of dollars; 2) Vitol and GCAC had a lender-borrower relationship; and 3) the "debt" should be found non-dischargeable.

---

[33] Exhibit 1, Page 2, Paragraph 7

**MOTION FOR SUMMARY JUDGMENT**  Page - 10

**Statute of Frauds**

49. The Debtor requested that Vitol produced all "executed financing agreements between GCAC and Vitol. In response, Vitol stated that the agreement may be found at GCAC004694 through GCAC004695 (i.e."**The Email**")[34].

50. Vitol is relying on the Email it received from the Debtor as evidence of the alleged Interim Financing Agreement.[35]

51. Pursuant to Sec. 26.02(b) of the Business and Commerce Code, a loan agreement in which the amount involved exceeds $50,000.00 in value is not enforceable unless the agreement is in <u>writing</u> and <u>signed</u> by the party to be bound or by that party's authorized representative.

52. Without the "existence of a valid contract" a Court cannot determine whether or not any damages were sustained by the Plaintiff. *Valero Mktg. & Supply Co. v. Kalaman Int'l*, 51 S.W. 3d 345, 351 (Tex.App.-Houston[1st Dist.] 2001, no pet.).

53. Neither Brass nor GCAC ever executed a written loan agreement that was signed by any party, and Vitol does not contest this fact, and relies on the Email from Mr. Brass as evidence of an "interim financing agreement".

54. On its face, the Email does not constitute a loan as there are no promises to pay, no dates, no interest rate, no dollar amount, no acceptance of a promise, and no executed documents.

55. Most importantly, the Email does not comply with the Statute of Frauds as it was never signed by Brass or GCAC, the parties who are allegedly bound by the Email.

56. In summary, the Statute of Frauds specifically prohibits the introduction of any evidence of a loan between Vitol and the Debtor as there was no writing signed by the parties.

57. If the Court cannot determine that a loan existed, then the Court cannot possibly determine that the alleged loan is non-dischargeable.

58. The United States Supreme Court has held that in order for a creditor to establish that a debt is nondischargeable, he must demonstrate that there is a causal nexus between the fraud and the debt. *See Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

59. Here, the only evidence that Vitol produced in response to the Debtor's specific request for production of the alleged loan agreement between the Parties is an Email that 1) does not

---

[34] Exhibit 9 (the, Email)
[35] Exhibit 7 (Response to RFP#4) and Exhibit 8 (Document produced in response to RFP#2)

constitute a contract; 2) does not comply with the Statute of Frauds; and 3) is inadmissible to prove a contract or debt existed. Therefore, there can be no nexus between any alleged fraud when there is no evidence of a debt.

## SUMMARY

60. Here, the Debtor simply failed to comply with the Settlement Agreement. Failure to pay the Settlement Agreement was nothing more than a breach of contract that is clearly dischargeable in bankruptcy.

61. Pursuant to Rule 56, the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.

62. Here, the following facts are uncontroverted:

    a. Vitol asserts in its Amended Complaint and in discovery responses that Vitol was GCAC's lender.
    b. Vitol relies on the Email as evidence of the written financing agreement between Vitol and GCAC.
    c. The Settlement Agreement was executed by Vitol and the Debtor.
    d. The Final Settlement Agreement released and forever discharged fraud claims.
    e. The Settlement Agreement and the Agreed Judgment make no reference to any admission of fraud by the Debtor or GCAC.

63. This Court is not required to go "behind the Settlement Agreement" if the Court determines that fraud claims were specifically released in the Settlement Agreement.

64. Even if the Court decides to look behind the Settlement Agreement, then this would be a futile exercise as Vitol would be prohibited by the Statute of Frauds from introducing any evidence regarding an alleged loan that was not in writing or signed by the Debtor or GCAC.

65. Without evidence of a loan, Vitol cannot possibly prove that this alleged loan was obtained by fraud and is therefore non-dischargeable.

## PRAYER FOR RELIEF

WHEREFORE, Arthur J. Brass requests that the Court enter an order granting his *Motion for Summary Judgment* against Vitol, Inc. declaring that the debt owed by the Debtor to Vitol is discharged.

Dated: April 18, 2022

        Respectfully submitted,
By: */s/ Miriam Goott*
    Miriam Goott
    attorney-in-charge
    SBN 24048846
    COUNSEL FOR THE
    DEBTOR/DEFENDANT

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208
(713) 956-5577 (telephone)
(713) 957-3358 (fax)
mgoott@walkerandpatterson.com

## CERTIFICATE OF SERVICE

I, Miriam Goott, hereby certify that a copy of the Motion for Summary Judgment and all exhibits were served on Vitol's counsel via electronic transmission on April 18, 2022.

By: */s/ Miriam Goott*
Miriam Goott