**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| ARTHUR JACOB BRASS, | § | Case No. 21-60025 |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| VITOL INC. | § | |
| | § | |
| v. | § | Adversary No. 21-06006 |
| | § | |
| ARTHUR JACOB BRASS | § | |

**PLAINTIFF VITOL INC.'S RESPONSE IN OPPOSITION TO DEBTOR'S MOTION**
**FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

I. Introduction ...................................................................................................................1

II. Statement of Facts .........................................................................................................3
    A.    The Transfers to Insiders were made when GCAC was insolvent..........................3
    B.    Debtor never made any payments under either of the Settlement Agreements. ...................................................................................................6

III. Arguments and Authorities .........................................................................................7
    A.    The reduction of claims to a settlement agreement or agreed judgment does not alter the fact that the judgment nevertheless arose from fraudulent conduct. ...................................................................................................8
    B.    The Statute of Frauds does not apply to the agreement between Vitol and the Debtor. ...............................................................................................11
    C.    There is evidence to Support Vitol's claim under Section 523(a)(4)....................11
    D.    Regardless of the Debtor's Arguments, Vitol's claims still survive under *Husky* ............................................................................................................13
        (1) The Transfers were to Insiders ........................................................................16
        (2) The Debtor Retained Control over the Transfers ............................................16
        (3) The Transfers were Concealed ........................................................................17
        (4) The Transfers Occurred while a Suit was Pending ..........................................18
        (5) The Transfers were Substantially All of the Debtor's Assets..........................18
        (6) The Debtor Removed and Concealed Assets ...................................................19
        (7) The Transfers were Not for Reasonably Equivalent Value .............................21
        (8) GCAC was Insolvent at the time of the Transfers...........................................21
        (9) The Transfers occurred while Substantial Debt was being Incurred...............22

PRAYER ............................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alport v. Ritter*,
  144 F.3d 1163 (8th Cir. 1998) ...............................................10

*Archer v. Warner*,
  538 U.S. 314 (2003)......................................................... *passim*

*Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*,
  804 F.2d 879 (5th Cir. 1986) .................................................8

*Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*,
  L.P., 58 S.W.3d 263 (Tex. App.—Fort Worth 2001, pet. denied)..........................12

*Burrell-Richardson v. Ma. Bd. of Higher Ed. (In re Burrell-Richardson)*,
  356 B.R. 797 (B.A.P. 1st Cir. 2006) .........................................9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................7

*First Nat'l Ins.Co. v. Kapetanakis (In re Kapetanakis)*,
  Nos. 08-32002, 08-03237, 2010 Bankr. LEXIS 1118 (Bankr. S.D. Tex. Apr. 12, 2010) ..............................................................10

*Giaimo v. DeTrano (In re DeTrano)*,
  326 F.3d 319 (2nd Cir. 2003)..................................................9

*Hackney v. Johnson*,
  601 S.W.2d 523 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.)........................12

*Husky Int'l Elecs., Inc. v. Ritz*,
  578 U.S. 355, 136 S. Ct. 1581 (2016)........................................ *passim*

*Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*,
  567 B.R. 715 (Bankr. S.D. Tex. 2017) ...................................... *passim*

*Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*,
  Adv. No. 10-03156 (Bankr. S.D. Tex.)........................................13

*Lawler v. Dallas Statler-Hilton Joint Venture*,
  793 S.W.2d 27 (Tex. App.—Dallas 1990, writ denied) ........................12

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) .................................................7

*In re Luce*,
  960 F.2d 1277 (5th Cir. 1992) .................................................................................10

*Mack v. Equable Ascent Fin., L.L.C.*,
  748 F.3d 663 (5th Cir. 2014) ....................................................................................7

*Milbank v. Tomlin (In re Tomlin)*,
  Nos. 99-35175-BJH-7, 01-3458, 2003 Bankr. LEXIS 2295 (Bankr. N.D. Tex.
  Aug. 27, 2003) ........................................................................................................20

*Moore v. Bearkat Energy Partners, LLC*,
  10-17-00001-CV, 2018 WL 683754 (Tex. App.—Waco Jan. 31, 2018, no
  pet.) .........................................................................................................................12

*Soza v. Hill (In re Soza)*,
  542 F.3d 1060 (5th Cir. 2008) .................................................................................14

*Truly v. Austin*,
  744 S.W.2d 934 (Tex.1988)......................................................................................12

**Statutes**

11 U.S.C. § 101(31) .......................................................................................................16

11 U.S.C. § 523 .............................................................................................................13

11 U.S.C. § 523(a)(2)(A) .....................................................................................10, 13, 14

11 U.S.C. § 727(a)(2) ....................................................................................................15

12 U.S.C. § 1701 ...........................................................................................................11

Tex. Bus. & Com. Code Ann. § 24.001 .........................................................................14

Tex. Bus. & Com. Code Ann. § 24.005 .........................................................................14

Tex. Bus. & Com. Code Ann. § 24.005(a) .....................................................................15

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) .................................................................15

Tex. Bus. & Com. Code § 24.002(7) ..............................................................................16

Tex. Bus. Com. Code Section 26.02(a)(1).....................................................................11

Tex. Bus. Com. Code Section 26.02(a)(2).....................................................................11

Tex. Bus. Com. Code § 26.02(b) ...................................................................................11

Tex. Fam. Code § 3.003 ................................................................................................20

Tex. Fam. Code § 101.007.............................................................................................................20

**Rules**

Fed. R. Bankr. P. 7056............................................................................................................7

Fed. R. Civ. P. 56..................................................................................................................7

Vitol Inc. (the "**Vitol**" or "**Plaintiff**") files this response in opposition (the "**Response**") to the Debtor's *Motion for Summary Judgment* [Docket No. 58] (the "**Motion**") filed by Arthur Jacob Brass (the "**Debtor**") and, in support thereof, would respectfully show this Court as follows:

## I.  <u>INTRODUCTION</u>

1.     This nondischargeability case arises from a fraudulent conveyance scheme in which the Debtor took money from his insolvent company and used those finds for personal purposes (building a vacation home and making dividends to his mother). As a result of the Debtor's improper diversion of funds, Gulf Coast Asphalt Company ("**GCAC**") was unable to repay over $14.7 million of the more than $65 million in financing and other advances Vitol provided to or for the benefit of GCAC. In total, the Debtor took $4,143,224.34 from GCAC for himself and sent $1,344,748.69 to his mother - a total of $5,487,973.03 (collectively, the "**Transfers**"). The Transfers were done at a time when GCAC was insolvent and were part of the Debtor's fraudulent conveyance scheme from which Vitol's claims arise.

2.     Because GCAC failed to repay over $14 million in Vitol's financing, the parties engaged in litigation that resulted in two settlement agreements: the first for $8 million (which GCAC refused to pay) and a second for $10 million (that was never paid). The second settlement agreement included an agreed judgment against the Debtor and GCAC in the amount of $10 million. Neither the settlement agreement nor the judgment speaks to the Debtor's conduct in the underlying lawsuit or whether the judgment was intended to be dischargeable in bankruptcy. To the contrary, the second settlement provides that it was made "solely to avoid the expense of further investigation or litigation." Despite clearly disclaiming a resolution of the underlying claims, the Debtor now seeks summary judgment on the theory that the settlement agreement somehow insulates him from claims of nondischargeability. The case the Debtor cites in support of its thesis,

*Archer v. Warner*, 538 U.S. 314 (2003), in fact stands for the proposition that a settlement agreement does **not** convert a nondischargeable fraud claim into to a dischargeable contract claim.

3.      Alternatively, the Debtor argues that if the Court looks "behind" the settlement agreement to the underling conduct, Vitol's claims should be dismissed because "there is no evidence of a debt," as the statute of frauds "prohibits the introduction of any evidence of a loan between Vitol and the Debtor as there was no writing signed by the parties." Here the Debtor's flawed analysis is predicated on a statute that applies only to specific financial institutions – which Vitol is not.

4.      Finally, the Debtor seeks summary judgment on Vitol's claim under Section 523(a)(4) because "Vitol affirmatively and repeatedly alleges that Vitol was GCAC's lender" and that no fiduciary duty exists between borrowers and lenders. The Debtor's assertion might gain traction if the Debtor were to concede that the $65 million provided by Vitol was, in fact, a loan to GCAC. However, the Debtor continues to insist that Vitol and GCAC were parties to a profit sharing joint venture. In the unlikely event the Debtor is able to prove at trial that Vitol was a joint venturer with GCAC (rather than a lender), the Debtor owed Vitol fiduciary duties that were violated when he misappropriated asphalt sales proceeds. Accordingly, summary judgment is inappropriate on each of the grounds asserted by the Debtor.

5.      Moreover, even assuming that the Debtor's summary judgment assertions are correct and the second settlement agreement limits Vitol to a breach of contract claim, Vitol may still pursue its nondischargeability claims. Under the Supreme Court's *Husky* analysis, the term "actual fraud" in Section 523(a)(2) is not limited to a misrepresentation found in traditional common law fraud.[1] Rather, it has been broadly construed to include "fraudulent conveyance

---

[1] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 355, 136 S. Ct. 1581, 1583 (2016).

schemes, even when those schemes do not involve a false representation."[2] Here, the Transfers are nondischargeable obligations of the Debtor because they were part of a fraudulent scheme to hinder, delay, and defraud Vitol. Thus, summary judgment is improper.

## II.    STATEMENT OF FACTS

### A.    The Transfers to Insiders were made when GCAC was insolvent.

6.    Beginning in at least 2017, the Debtor owned a 50% interest in GCAC through his wholly owned interest in Trifinery, Inc. ("**Trifinery**"),[3] and the Debtor's mother, Joyce Brass, owned the other 50% of GCAC.[4] At that time the Debtor exercised complete financial control over GCAC.[5] From July 2017 through February 2018 Vitol supplied the Debtor with financing to fund its operations.[6] In total, Vitol provided in excess of $65 million in financing[7] to GCAC.[8] Despite repeated demands, GCAC failed to repay over $14.7 million of the financing.[9]

---

[2] *Id.*

[3] Deposition of Arthur Jacob Brass dated March 25, 2022 (the "**Brass Depo 2022**"), at 34:2-25, 35:1-2, attached hereto as **Exhibit 1;** Deposition of Arthur Brass dated June 28, 2018 ("**Brass Depo 2018**") at 45:23-46:19, attached hereto as **Exhibit 2**.

[4] Brass Depo 2022, 35:3-5.

[5] Brass Depo 2022, 26:15-19, ("Q: So you were the primary decision maker of GCAC? A: Yes. Q: You ran the company? A: Yes."); Brass Depo 2022, 43: 23-25, 44:1-5 ("Q: Who made the decision on when you would take those distributions? . . . A: Ultimately the decision was made by either myself or myself and my father."); Brass Depo 2022, 45: 13-14 (confirming GCAC did not have a board of directors); Deposition of GCAC dated 11/03/2020 ("**GCAC Depo. 2020**") at 89:11-14 ("Q. Okay. It's true that A.J. Brass is the -- has complete authority over the finances of GCAC and has since 2017? A. Yes. Q. No one else has signatory power on the GCAC bank account? A. No, I don't believe so.") attached hereto as **Exhibit 8**.

[6] *See, e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), attached hereto as **Exhibit 3**; email from A. Brass to J. Tomaszewski 8/3/2017 ("Iberia payroll account overdrawn needs to be covered … Operating account was charged to cover payroll, now operating account is overdrawn and outstanding checks will be sent back with insufficient funds … If we don't get Vitol money this am I'll have to transfer more in.") (AJB0003960), attached hereto as **Exhibit 4**.

[7] The Debtor misrepresents to this Court as an "undisputed fact" that Vitol did not lend *money* to the Debtor or GCAC. In support of this falsehood, the Debtor misquotes Vitol's responses to the Debtor's interrogatories. For example, Vitol's response to the Debtor's first interrogatory reads "Vitol provided Debtor ***with tens of millions of dollars of financing consisting of*** product purchases, hedging services/purchases, deal costs, storage and transportation costs, and other associated fees and costs while also assuming the credit risk for the same." (emphasis added).

[8] *See, e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), attached hereto as Exhibit 3.

[9] *See, e.g.,* email from M. Ruzek to R. Evans dated 4/16/2018 (Vitol_00082861), attached hereto as Exhibit 3.

---

7.      Unbeknownst to Vitol, GCAC was insolvent the entire time Vitol was providing financing.[10] At the same time, the Debtor was syphoning funds from GCAC for his personal use and used GCAC as his personal bank account.[11] During the course of the financing arrangement with Vitol, the Debtor caused GCAC to transfer to himself and his mother millions of dollars in undocumented, evergreen loans.[12] GCAC did not have any written agreements regarding these transfers to the Debtor or his mother, and there were no recorded repayment terms, maturity dates, or interest rates.[13] The Debtor used this money to pay his own personal expenses, including a payment of $582,737.02 directly to the contractor building his multi-million dollar vacation home.[14]

8.      The Transfers themselves may be identified in multiple contemporaneous records, including those produced by the Debtor, GCAC, GCAC's accounting firm EEPB, Inc. ("**EEPB**"), and by the Debtor and GCAC's respective banks.[15] For example, a Loan Summary extracted from GCAC's general ledger shows that on July 1, 2017, at the outset of the Vitol-GCAC financing agreement, Joyce Bass had a loan balance of $86,696.65 while the Debtor had a negative balance of $799,332.09 (meaning the Debtor credited himself with a loan **to** GCAC of nearly $800,000).[16]

---

[10] *See* Declaration of G. Deetz attached hereto as **Exhibit 5**.

[11] Brass Depo 2022, 38:3-7 (discussing taking GCAC's proceeds from the sale of the ARC Terminals for personal use); Brass Depo 2022, 43:17-19 (A: Over the period of time that I owned GCAC, I did receive profit distributions from GCAC.").

[12] Brass Depo 2018 at 45:23-46:19, Brass Depo 2022, 111:24-112:12, Exhibit 13 to Brass Depo. 2022 attached hereto as **Exhibit 6**; 115:24-116:18, Exhibit 14 to Brass Depo. 2022, attached hereto as **Exhibit 7.**

[13] GCAC Depo 2020 87:14-88:6 ("Q. What -- there's no promissory note related to that loan, right? A. Correct. Q. What's the repayment date on that loan? A. It doesn't have a repayment date. Those loans never have. They've been advanced and paid back over 20· years. Q. No -- so let me get this straight. For the money that GCAC loaned you personally to pay for the construction of your golf vacation house, there was no promissory note, right? A. Correct. Q. There was no repayment date, correct? A. Correct. And you can't tell me what the interest rate is on that loan? A. I can tell you it's whatever the federally mandated interest rate was") attached hereto as **Exhibit 8**.

[14] Brass Depo 2022, 132:17-133:13, Exhibit 19 to Brass Depo. 2022, attached hereto as **Exhibit 9.**

[15] During the State Court Litigation, GCAC produced an export of its general ledger accounts for loans to the Debtor and Joyce Brass (the "**Loan Summary**") and filed it in Response to Vitol's Motion to Compel. GCAC Depo. 2020 95:11.

[16] *See* Loan Summary, Exhibit 6.

---



**Gulf Coast Asphalt Co., LLC**
**General Ledger**
**For the Period From Jan 1, 2015 to Jun 30, 2019**
Filter Criteria includes: 1) IDs: 1250. Report order is by ID. Report is printed with shortened descriptio

| Account ID | Account Descriptic | Date | Jrnl | Loan | Repaid | Balance |
|---|---|---|---|---|---|---|
| 1250 | Loan - A.J. Brass | 6/30/17 | | | | -799,332.09 |

9.      Once Vitol began financing GCAC in July 2017, these loan amounts increased dramatically as a result of the Transfers. By January 1, 2018, Joyce's debt to GCAC had grown to $946,969.55 and the Debtor went from a negative $799,332.09 to a positive $2,091,872.25 - meaning he "repaid" himself the $799,332.09 he alleged loaned to GCAC and withdrew nearly $1.3 million more in "loans" **_from_** GCAC.

| 1250 | Loan - A.J. Brass | 12/31/17 | | | | 2,091,872.25 |
|---|---|---|---|---|---|---|
| 1250 | Loan - A.J. Brass | | | | | |

10.      By May 2018, these insider withdrawals ballooned to $1,431,445.34 and $3,343,892.25 respectively.[17] Accordingly, from the time Vitol began financing GCAC in July 2017 until May 2018, the Debtor transferred a combined $5,487,973.03 to himself and his mother.

| 1250 | Loan - A.J. Brass | 5/18/18 | CDJ | 50,000.00 | | |
|---|---|---|---|---|---|---|
| 1250 | Loan - A.J. Brass | | | 60,000.00 | | 60,000.00 |
| 1250 | Loan - A.J. Brass | 5/31/18 | | | | 3,393,892.25 |

11.      The Transfers continued until June 30, 2019 at the least, the last date on the Ledger Summary. As of that date, the balance of the Transfers were $1,561,445.34 to Joyce Brass and $5,766,433.86 to the Debtor.[18] Although GCAC and the Debtor provided Vitol with the Loan

---

[17] Exhibit 13 to Brass Depo. 2022; Exhibit 14 to Brass Depo. 2022, Exhibits 6-7.
[18] Exhibits 6-7.

Summary in December 2019, more recent data was not available, supposedly because a power surge destroyed GCAC's servers.[19]



| 1250 | Loan - A.J. Brass | 6/30/19 | 5,766,443.86 |

12.     The Transfers in the Loan Summary are also recorded in GCAC's bank statements as outgoing wires and checks and the majority are also found as deposits in the Debtor's bank statements.[20] The Transfers were likewise recorded in GCAC's accounting data retained by its accountant EEPB and used in the preparation of GCAC's tax returns.[21]

**B.     Debtor never made any payments under either of the Settlement Agreements.**

13.     As a result of GCAC's failure to repay Vitol, litigation ensued in Harris County.[22] In October 2020, the Debtor, GCAC, and Trifinery (a company for which Brass is the sole shareholder and whose only business is holding the Debtor's ownership interest in GCAC)[23] entered into a Confidential Settlement Agreement and Mutual Global Release (the "**First Settlement Agreement**") in which they agreed to pay Vitol $8 million to resolve the financing

---

[19] Dec. 12, 2019 email from GCAC lawyer attached hereto as **Exhibit 10**.

[20] Excerpts from GCAC's Bank Statements, attached hereto as **Exhibit 11**. Excerpts from the Debtor's Bank Statements, attached hereto as **Exhibit 13**. Vitol only has the Debtor's complete IBC bank records from June 26, 2017 – Aug. 27, 2018. When presented with his own and GCAC's bank statements at his deposition, the Debtor recognized them and verified they were his and GCAC's. GCAC Depo. 2020 91:15-98:5. The Transfers which were not directly deposited into the Debtor's bank account were nevertheless for his personal benefit and include: (1) a wire transfer from GCAC directly to the contractor for his vacation home, Byer Builders; (2) the proceeds from the sale of GCAC's holdings in Arc Terminals; (3) a wire transfer to Square 1 Containers LLC, an entity in which the Debtor owns a 30% interest per his bankruptcy schedule; and (4) a wire transfer to Popper & Company, LLC, a firm that did work with the Debtor's companies, including Trifinery as shown on Trifinery's bankruptcy schedules.

[21] EEPB's managing director Michael Wagner also verified that the GCAC accounting documents given to Vitol pursuant to a subpoena were made and kept in the ordinary course of business. EEPB affidavit attached hereto as **Exhibit 14**. Tomaszewski exhibits 4 and 6 attached hereto as **Exhibit 15-16**. GCAC's former CFO and bookkeeper, John Tomaszewski verified that he recognized the balance sheets and that they were GCAC's from the relevant time. Deposition of J. Tomaszewski, attached hereto as **Exhibit 17**.

[22] *See* Counterclaim filed by Vitol attached hereto as **Exhibit 18**.

[23] Brass Depo. 2022 34: 2-25, 35:1-2.

---

dispute.[24] The Debtor failed to make *any* settlement payments and on November 5, 2020 the Debtor, GCAC, and Trifinery entered into a Second Confidential Settlement Agreement and Mutual Global Release (the "**Second Settlement Agreement**").[25] In accordance with the Second Settlement Agreement, the parties filed an Agreed Final Judgment jointly and severally against the Debtor, GCAC, and Trifinery in the amount of $10 million in favor of Vitol.[26] The Agreed Final Judgment was entered on November 20, 2020 and is still outstanding in its entirety.[27]

14.     On March 23, 2021, each of the Debtor, GCAC, and Trifinery filed Chapter 7 bankruptcies in this Court.[28] Vitol filed a proofs of claim in each bankruptcy based on the Agreed Final Judgment.[29]

## III.  ARGUMENTS AND AUTHORITIES

15.     A court may grant a motion for summary judgment only if there is no genuine issue of material fact and the movant shows its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mack v. Equable Ascent Fin., L.L.C.*, 748 F.3d 663, 665 (5th Cir. 2014) citing to *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When both parties have submitted evidence of contradictory facts, courts resolve factual controversies in favor of the nonmoving party. *Little*, 37 F.3d at 1075. The court must review the evidence and any inferences to be drawn therefrom in

---

[24] *See* Confidential Settlement Agreement and Mutual Global Release (BK-Vitol0000022), attached hereto as **Exhibit 19**.

[25] *See* Second Confidential Settlement Agreement and Mutual Global Release (BK-Vitol0000009), attached hereto as **Exhibit 20**.

[26] *See* Agreed Final Judgment, attached hereto as **Exhibit 21**.

[27] *See, e.g.,* Brass Bankruptcy Schedules [Dkt. No. 19] at page 55, attached hereto as **Exhibit 22**.

[28] *See* Case No. 21-60023; Case No. 21-60024; Case No. 21-60025.

[29] *See* Case No. 21-60023, Proof of Claim No. 2-1; Case No. 21-60024, Proof of Claim No 5-1; Case No. 21-60025, Proof of Claim No. 6-1. Moreover, the Debtor scheduled the entire $10 million judgment and did not indicate that it was contingent, unliquidated, or disputed.

---

a light most favorable to the non-moving party. *See Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir. 1986) (per curiam).

16.     Here, the Debtor is not entitled to summary judgment because he failed to demonstrate that no issues of material fact exist. To the contrary, and as detailed herein, there are a number of genuinely disputed issue of material fact that must be litigated in connection with each of Vitol's inherently fact-intensive claims for exception to discharge under Section 523(a).  The Debtor's Motion relies on incorrect interpretations of law and, at best, disputed facts.

**A.      The reduction of claims to a settlement agreement or agreed judgment does not alter the fact that the judgment nevertheless arose from fraudulent conduct.**

17.     In the Motion, the Debtor alleges that Vitol's tort claims were released and superseded by the Second Settlement Agreement and, therefore, Vitol's only surviving claims sound in contract and, thus, are dischargeable. Contrary to the Debtor's assertion, the Second Settlement Agreement does not negate Vitol's nondischargeability claims because (a) the agreement does not claim to establish liability for the underlying conduct at issue and, thus, cannot be used for collateral estoppel purposes, and (b) the *Archer* case directs bankruptcy courts to look at the Debtor's underlying behavior to determine nondischargeability.

18.     The Debtor relies on the concept of novation to allege that any fraud the Debtor committed is superseded by the Second Settlement Agreement. In support of this contention, the Debtor relies on the Supreme Court's decision in *Archer*. In fact, the *Archer* decision stands for exactly the opposite proposition: that a settlement agreement does **not** convert a nondischargeable debt arising from fraud to a dischargeable debt arising from breach of contract except in limited circumstances not applicable here. *Archer v. Warner*, 538 U.S. 314, 322 (2003) ("We conclude that the Archers' settlement agreement and releases may have worked a kind of novation, but that fact

does not bar the Archers from showing that the settlement debt arose out of 'false pretenses, a false

representation, or actual fraud,' and consequently is nondischargeable.").

> …[t]he settlement agreement and promissory note here, coupled
> with the broad language of the release, completely addressed and
> released each and every underlying state law claim. That agreement
> left only one relevant debt: a debt for money promised in the
> settlement agreement itself. To recognize that fact, however, does
> not end our inquiry. We must decide whether that same debt can *also*
> amount to a debt for *money obtained by fraud*, within the terms of
> the nondischargeability statute. Given this Court's precedent, we
> believe that it can.

*Archer v. Warner*, 358 U.S. at 318-19 (internal citations omitted).  As the Supreme Court went on

to explain, there is a clear distinction between, on the one hand, whether the parties intended their

agreement to resolve all claims between them and, on the other hand, whether the parties intended

that settlement to absolve the fact that the debts thus settled originally arose from fraudulent or

tortious conduct.  *Id.* at 322 ("A debt embodied in the settlement of a fraud case 'arises' no less

'out of' the underlying fraud than a debt embodied in a stipulation and consent decree.").

19.      "Reducing a fraud claim to a settlement does not definitively change the nature of

the debt for dischargeability purposes." *Burrell-Richardson v. Ma. Bd. of Higher Ed. (In re Burrell-*

*Richardson)*, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006); *see also Giaimo v. DeTrano (In re*

*DeTrano)*, 326 F.3d 319, 322 (2nd Cir. 2003)("if the tort claims against [the debtor] would have

created a nondischargeable debt [. . .] had those claims been litigated to judgment in [the creditor's]

favor, then it is no defense for [the debtor] to state that he has replaced that possible liability with

a dischargeable contractual obligation through the settlement agreement."). "Where . . . the

judgment does not indicate the cause of action on which liability is based, *res judicata* does not

apply and a creditor is allowed to prove in a subsequent nondischargeability proceeding that the

underlying debt is based in fraud." *In re DeTrano*, 326 F.3d at 322. Thus, under *Archer* and its

progeny, a settlement agreement only precludes a nondischargeability claim if it specifically resolves culpability for the underlying tort claim.

20.     Here, the Second Settlement Agreement does not specifically resolve the Debtor's culpability for the underlying tort claims. To the contrary, the second settlement provides that it "settle[s] all claims asserted in the Lawsuit" and that it was made "solely to avoid the expense of further investigation or litigation."[30] Thus, under *Archer*, the Second Settlement Agreement does not change the nature of the debt for dischargeability purposes.

21.     Furthermore, that Vitol cited the Second Settlement Agreement in its proof of claim has no bearing on the validity of Vitol's dischargeability claims in this adversary proceeding. Although "the Court looks to the foundation of the debt . . . for determining whether the debt is excepted from discharge, the Court looks to the [judgment] to determine the amount of the debt." *First Nat'l Ins.Co. v. Kapetanakis (In re Kapetanakis)*, Nos. 08-32002, 08-03237, 2010 Bankr. LEXIS 1118, at *11 (Bankr. S.D. Tex. Apr. 12, 2010) citing to *Archer v. Warner,* 538 U.S. 314, 316, 123 S. Ct. 1462, 155 L. Ed. 2d 454 (2003); *In re Luce,* 960 F.2d 1277, 1285 (5th Cir. 1992) (holding that legal fees and costs may also be nondischargeable with the underlying debt if they are provided by state statutory or contractual grounds); *Alport v. Ritter,* 144 F.3d 1163, 1168 (8th Cir. 1998) (referring to the base contract to determine whether legal fees may be included in a nondischargeable debt under § 523(a)(2)(A)). Thus, the existence of the Second Settlement Agreement and Vitol's filing of a timely proof of claim do not—as the Debtor claims—defeat Vitol's claims as a matter of law, and cannot serve as a basis for summary judgment in the Debtor's favor.

---

[30] Second Settlement Agreement ¶ 1 p. 2.

**B.      The Statute of Frauds does not apply to the agreement between Vitol and the Debtor.**

22.      The Debtor also alleges that Vitol's underlying claim for breach of a financing agreement by GCAC is meritless because Section 26.02(b) of the Texas Business and Commerce Code requires a loan agreement to be in writing. The Debtor bases this argument on an incorrect understanding of the legal authority. The applicability of Section 26.02(b) of the Texas Business and Commerce Code is limited to agreements "pursuant to which a financial institution" loans money. Tex. Bus. Com. Code Section 26.02(a)(2). The Code defines a financial institution as "a state or federally chartered bank, savings bank, savings and loan association, or credit union, a holding company, subsidiary, or affiliate of such an institution, or a lender approved by the United States Secretary of Housing and Urban Development for participation in a mortgage insurance program under the National Housing Act (12 U.S.C. Section 1701 et seq.)." Tex. Bus. Com. Code Section 26.02(a)(1). The Debtor does not allege, much less introduce evidence that Vitol qualifies as a financial institution and, thus, fails to establish a necessary predicate for the applicability of this provision.  Regardless, however, the inapplicability of this statute to Vitol means it cannot be employed as the Debtor contends to defeat Vitol's claims as a matter of law.

**C.      There is evidence to Support Vitol's claim under Section 523(a)(4)**

23.      Finally, the Debtor alleges that Vitol's claims under Section 523(a)(4) must be dismissed because "Vitol affirmatively and repeatedly alleges that Vitol was GCAC's lender" and no fiduciary duties exist from borrowers to lenders. The Debtor's assertion *could* gain traction if the Debtor were willing to concede that the $65 million provided by Vitol was, in fact, a loan to GCAC. However, the Debtor continues to maintain that Vitol and GCAC were parties to a profit

sharing joint venture.[31] Indeed, the Motion itself alludes to the Debtor's maintenance of such a position. *See* Motion at ¶ 46 ("Vitol refuses to allege that it had a joint venture with GCAC").

24.     Vitol has pleaded its claim under Section 523(a)(4) in the alternative in the unlikely event that the Debtor is able to demonstrate at trial that the relationship between Vitol and GCAC was a joint venture. To be clear, Vitol does not believe that a joint venture existed between the parties; *but* if the Debtor is able to demonstrate the relationship was a joint venture, then the Debtor owed a fiduciary duties to Vitol. "Under Texas law, joint ventures are legal entities described as being 'in the nature of a partnership engaged in the joint prosecution of a particular transaction for mutual profit.'" *Lawler v. Dallas Statler-Hilton Joint Venture*, 793 S.W.2d 27, 33 (Tex. App.—Dallas 1990, writ denied) (citing to *Brown v. Cole,* 155 Tex. 624, 631, 291 S.W.2d 704, 709 (1956)). "Generally, joint ventures are governed by the rules applicable to partnerships. *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex.1988); *Hackney v. Johnson,* 601 S.W.2d 523, 526 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.); *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*, L.P., 58 S.W.3d 263, 273 (Tex. App.—Fort Worth 2001, pet. denied). A formal fiduciary relationship, which arises as a matter of law, exists between partners and joint venturers. *Moore v. Bearkat Energy Partners, LLC*, 10-17-00001-CV, 2018 WL 683754, at *8 (Tex. App.—Waco Jan. 31, 2018, no pet.) (explaining the difference between formal and informal fiduciary relationships).

25.     Thus, in the unlikely event that the Debtor is able to demonstrate at trial that a joint venture existed between GCAC and Vitol, the Debtor violated his fiduciary duties by misappropriating asphalt sales proceeds for his own personal benefit.

---

[31] Brass Depo 2018 at 10:11-21 ("Q. Okay. And on that 60 million that Vitol paid for these products, GCAC agreed to reimburse Vitol, true? A. No. Q. Okay. What do you think is different from what 16· I just said? A. I think that Vitol purchased those products, that Vitol and GCAC collectively sold those products, and that the profits or losses from those ultimate sales after all the attendant costs were to be split between the parties."); Brass Depo 2022, 47:11-24.

**D.      Regardless of the Debtor's Arguments, Vitol's claims still survive under *Husky*.**

26.      Even assuming, *arguendo*, that the Debtor's interpretation of *Archer* is correct that the Settlement Agreement is a novation, Vitol may still pursue its claims under section 523(a)(2). Regardless of the nature of Vitol's underlying debt – whether it sounds in contract or tort – Vitol may pursue a nondischargeability claim arising from the Debtor's misappropriation of the Transfers.

27.      *Husky* was a watershed decision for nondischargeability claims arising from a debtor's fraudulent conduct. Prior to *Husky*, a split existed among the circuit courts regarding whether "actual fraud" required a misrepresentation to deny a discharge. In *Husky*, the Supreme Court decided that a constructively fraudulent transfer was sufficient to deny a discharge under 523(a)(2)(a) in the context of claim arising from breach of a master credit and sales agreement.[32]

28.      "The Bankruptcy Code prohibits debtors from discharging debts obtained by . . . false pretenses, a false representation, or actual fraud."[33] The term "actual fraud" is not limited to a misrepresentation found in traditional common law fraud.[34] Rather, it has been broadly construed to include "fraudulent conveyance schemes, even when those schemes do not involve a false representation."[35] Where a debtor engaged in such a fraudulent scheme, a creditor can pierce the corporate veil and hold the debtor who orchestrated the scheme personally liable and the court may then hold those debts nondischargeable.[36] Here, the Transfers are a nondischargeable obligation of

---

[32] The Supreme Court's consideration of imputed nondischargeability under Section 523(a)(2)(a) arising from a separate party's fraudulent conduct in *Bartenwerfer v. Buckle*y, U.S., No. 21-908, cert. granted May 2, 2022, will not have an impact on the nondischargeability determination here because the Debtor is not an innocent spouse. Rather, the Debtor is on both sides of the transaction and was the party responsible for initiating the Transfers.

[33] 11 U.S.C. § 523(a)(2)(A).

[34] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 355, 136 S. Ct. 1581, 1583 (2016).

[35] *Id.* In the seminal *Husky* case, the underlying claim arose from breach of a Master Credit and Sales Agreement. *See* Plaintiff's Original Complaint to Deny Dischargeability of Debt Pursuant to 11 U.S.C. § 523, Docket No. 1, *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, Adv. No. 10-03156 (Bankr. S.D. Tex.).

[36] *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 738-39 (Bankr. S.D. Tex. 2017).

the Debtor because they were part of a fraudulent scheme to hinder, delay, and defraud Vitol.

29.     Under *Husky*, determining whether transfers are nondischargeable as part of a fraudulent conveyance scheme requires the Court to undertake the following three-step analysis:

(a)     "Are there sufficient badges of fraud for this Court to find that the Debtor committed actual fraud;"

(b)     "If so, was the Debtor's 'actual fraud' for his direct personal benefit;" and

(c)     is "the Debtor's personal liability []a nondischargeable obligation under § 523(a)(2)(A)."[37]

30.     Here, while Vitol submits that each of the three *Husky* elements is met here, at a minimum it is undeniable that there are several genuine issues of material fact relating to the *Husky* elements that make summary judgment flatly inappropriate here.

**The Badges of Fraud Demonstrate the Debtor's Fraudulent Intent**

31.     To prove that the Transfers were fraudulent, Vitol may either introduce direct evidence from the Debtor admitting that he intended to hinder, delay, or defraud Vitol or Vitol may introduce circumstantial evidence showing the Debtor's intent.[38] Circumstantial evidence of fraudulent intent may be demonstrated by undertaking a "badge of fraud" analysis.[39] The Texas Uniform Fraudulent Transfer Act ("**TUFTA**")[40] provides a non-exclusive[41] list of eleven (11)

---

[37] *Husky,* 567 B.R at 719.

[38] *Husky,* 567 B.R at 739-740 (*citing In re 1701 Commerce, LLC*, 511 B.R. 812, 835-36 (Bankr. N.D. Tex. 2014) ("Direct evidence of actual fraud is seldom available, so Texas law allows a plaintiff to rely on circumstantial evidence to prove actual intent.")).

[39] *Id.*

[40] Tex. Bus. & Com. Code Ann. § 24.001, et seq.

[41] Although the Tex. Bus. & Com. Code Ann. § 24.005 ("**TUFTA**") enumerates eleven badges of fraud, "courts have identified various badges of fraud that tend to evidence a transfer made with intent to defraud under § 548 and § 727: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry." *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

badges of fraud, including whether:[42]

> (1) the transfer was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer was concealed;
>
> (4) before the transfer was made was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[43]

32.     "Not all, or even a majority of the badges of fraud must exist to find actual fraud."[44]

Indeed, the presence of even a single badge of fraud may be sufficient.[45] Here, the Transfers exhibit

at least nine of the eleven enumerated badges of fraud.

---

[42] *Husky*, 567 B.R at 739-740 (citing to Tex. Bus. & Com. Code Ann. § 24.005(a)-(a)(1) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor").

[43] *Husky* analyzes the TUFTA badges of fraud to determine whether transfers by the debtor are nondischargeable under 11 U.S.C. § 727(a)(2). *See Husky*, 567 B.R.at 740.

[44] *Id.* (citing *In re Soza*, 542 F.3d 1060, 1066-67 (5th Cir. 2008)).

[45] *Husky*, 567 B.R. at 743 ("This first badge considers transfers to an insider. This badge is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud.").

(1) *The Transfers were to Insiders*

33.     Each of the Transfers was made to an insider of GCAC – the Debtor and his mother, Joyce Brass. Under TUFTA, insiders include directors, officers, control persons, and relatives of any director officer, or control person.[46] The Debtor was the president of GCAC,[47] owned 50% of GCAC through his holding company Trifinery,[48] and had "complete authority over the finances of GCAC."[49] Joyce Brass owned the other 50% of GCAC.[50] Thus, under TUFTA, each of the Transfers was made to an insider.

34.     Outside of TUFTA, courts considering insider status of individuals have evaluated "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[51] The Transfers were orchestrated by the Debtor to either himself or his mother. It is hard to imagine a greater closeness between transferor and transferee. This evidence alone creates a genuine issue of material fact regarding a *significant* element of the claim that counsels against summary judgment.[52]

(2) *The Debtor Retained Control over the Transfers*

35.     The Debtor retained possession or control over the Transfers as both the transferor and transferee. Indeed, most transfers were made directly from GCAC's bank account (for which the Debtor was the control person) to the Debtor's bank account, the Debtor's creditors, or the

---

[46] Tex. Bus. & Com. Code § 24.002(7); *see also* 11 U.S.C. § 101(31).

[47] Brass Depo 2018 36:6-10.

[48] Brass Depo 2018 45:23-46:19.

[49] GCAC Depo 2020 at 89:11-90:2.

[50] Brass Depo 2018 45:23-46:19.

[51] *Husky*, 567 B.R.at 743.

[52] "This badge is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." *Husky*, 567 B.R. at 743.

Debtor's mother.[53] Thus, the Debtor maintained control over the transferor and transferee of the Transfers.[54]

### (3) *The Transfers were Concealed*

36.       In determining whether transfers are concealed for purposes of dischargeability, the Court may consider whether the debtor attempted to reverse the transfers before the transferor filed for bankruptcy and whether the transfers were listed in the transferor's bankruptcy schedules.[55] As the president of GCAC and the personal with control over GCAC's finances,[56] the Debtor signed GCAC's bankruptcy schedules and statement of financial affairs.[57] Neither GCAC's bankruptcy schedules nor its statement of financial affairs indicate that the Debtor or his mother owed GCAC millions of dollars in unpaid loans.[58] Indeed, GCAC scheduled a meager $40,408.39 in total assets – none of which includes loans from the Debtor or his mother.[59] Likewise, there is nothing in the GCAC bankruptcy filings to indicate that the Debtor undertook any effort to repay the undisclosed loans to himself or his mother. This and other evidence of the Debtor's efforts to conceal the Transfers further warrants against a grant of summary judgment.

---

[53] *See* Loan Summary GCAC9511, Exhibit 6; GCAC Bank Records GCAC9846-10078, Exhibit 11; Brass bank records Brass50-90, Exhibit 13; GCAC Depo. 2020 96:11-98:21.

[54] *Husky,* 567 B.R at 744 (citing *Nwokedi v. Unlimited Restoration Specialists, Inc.,* 428 S.W.3d 191, 206 (Tex. App.— Houston [1st Dist.] 2014) (finding retention of possession when transferor was signatory on both transferor and transferee accounts)).

[55] *Husky,* 567 B.R at 749 ("Further, the Debtor, in his capacity of as director of Chrysalis, did not list on Chrysalis's Schedule B any claim that Chrysalis might have against him, individually, for his transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor- Controlled Entities … this Court finds that the Debtor concealed from Husky the transfers of $1,161,279.90 to the Debtor-Controlled Entities when he failed to disclose them on Chrysalis's SOFA and when he failed to disclose on Chrysalis's Schedule B that the company might have a cause of action against him, personally. Thus, this badge of fraud is present and weighs in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky. The Court gives this badge significant weight in no small part because the Debtor made material misrepresentations under oath on Chrysalis's SOFA and Schedule B. His failure to disclose the transfers of $1,161,279.90 and the cause of action against himself are not [m]atters so trivial in nature as to have but little effect upon the estate and upon creditors.").

[56] GCAC Depo 2020 at 89:11-90:2.

[57] *See* GCAC Chapter 7 Statement of Financial Affairs and Schedules in case no. 21-60024 at Dkt. 12 and 14.

[58] *Id.*

[59] *Id.* Dkt. 14 at p. 9.

---

(4) *The Transfers Occurred while a Suit was Pending*

37.     Each of the Transfers was made while a lawsuit was pending against GCAC and the Debtor. On February 10, 2017 (four months before the Transfers began), GCAC and the Debtor were sued by Superior Crude Gathering, Inc. ("**Superior**") for $1,831,799.67.[60] In the lawsuit, Superior alleges that it provided short-term financing for GCAC's purchase and sale of crude oil in connection with the shared use of a crude oil tank farm. Under this arrangement, Superior funded the purchase of crude oil by GCAC on credit, which GCAC would repay after the oil was resold. After all transactions were completed, GCAC failed to repay over $1.8 million in financing. Superior, thus, sued GCAC and the Debtor for, among other things, fraud. The Superior lawsuit was pending at the time each Transfers was made.

(5) *The Transfers were Substantially All of the Debtor's Assets*

38.     The Transfer represented substantially all of GCAC's assets at the time they were made. As of June 2017, the time the Transfers began, GCAC's balance sheet reflects $1,922,534 in "Current Assets" which includes $429,915 in receivables from employees (loans due from the Debtor and his mother – loans that were never repaid).[61] Thus, GCAC's actual "Current Assets" should have reflected less than $1.5 million in assets. Although the balance sheet also includes "Other Assets" none if which had any real value. At a time when GCAC's assets were less than $1.5 million and its total cash was negative $79,975, GCAC began transferring substantial funds to the Debtor, eventually totaling over $5.7 million in Transfers to Brass and $1.5 million in Transfers to Joyce Brass.[62]

---

[60] *See* Original Petition of Superior Crude Gathering, LLC, attached hereto as **Exhibit 23**.
[61] *See* GCAC 2017 Balance sheet, Exhibit 15; *See also* EEPB Affidavit, Exhibit 14.
[62] *See* Declaration of G. Deetz, Exhibit 5.

(6) *The Debtor Removed and Concealed Assets*

39.     The Debtor also removed and concealed assets. Failing to disclose to creditors the amount of and reasons for transfers to insiders in bankruptcy schedules indicates actual intent to defraud creditors.[63] Here, the Debtor orchestrated a scheme in which millions of dollars were siphoned from GCAC to insiders. The Debtor also signed sworn bankruptcy schedules on behalf of GCAC.[64] The loans are not included in any of GCAC's bankruptcy schedules.[65] Indeed, were it not for discovery in separate litigation against the Debtor and GCAC, Vitol (and other creditors) would have no knowledge of the Transfers, nor the reason such insider transfers were orchestrated by the Debtor. Again, this evidence creates a genuine and triable issue of fact regarding whether the Debtor removed and concealed assets from creditors.

40.     Additionally, the Debtor has sought to conceal tens of thousands of dollars in artwork from his creditors. On July 13, 2021, the Court authorized the Chapter 7 Trustee to retain an appraiser to prepare a written appraisal of the Debtor's assets.[66] The Trustee's Appraisal Report indicates that the Debtor significantly and materially undervalued various items and categories of personal property, including artwork.[67] For example, the Debtor valued a piece of "cow artwork" at $150.00.[68] According to the Trustee's Appraisal Report, the "cow artwork" is actually an

---

[63] *Husky,* 567 B.R at 749 ("Here, the Debtor did not disclose to Husky or any other creditors the amounts of and reasons for the transfers of $1,161,279.90 to the Debtor-Controlled Entities. Husky was entitled to payment for providing products to Chrysalis, and like the creditor in Vaso, was kept in the dark by the Debtor about his transfers of $1,161,279.90 to the Debtor-Controlled Entities. This is sufficient evidence for this Court to find that the Debtor concealed Chrysalis's assets. Indeed, the evidence presented at trial also leads this Court to find that the Debtor, by transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor-Controlled Entities, removed assets of Chrysalis—'which is sufficient proof of this badge of fraud even without a finding of concealment.' … Therefore, this badge is present and favors a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.").

[64] *See* GCAC Chapter 7 Statement of Financial Affairs and Schedules in case no. 21-60024 at Dkt. 12 and 14.

[65] *Id.*

[66] Cause No. 21-60025 [Docket No. 50].

[67] *Compare* Exhibit 22 at pages 22-49 *with* Appraisal Report, attached as **Exhibit 24**.

[68] *See* Debtor's Schedules, Exhibit 22.

---

original 1971 screen print by Andy Warhol titled "Cow" with a market resale value of $15,000.00.[69] Another egregious example concerns a piece of art described by the Debtor as "Bottle Cap Artwork" which the Debtor valued at $250.00.[70] According to the Trustee's Appraisal Report, the "Bottle Cap Artwork" refers to an original portrait by Molly B. Right with a market resale value of $12,000.00.[71] Each of these valuable pieces of artwork is listed in the Debtor's exemptions, which meet or exceed the statutory cap at their nominal value.[72] If properly valued, the artwork would render assets non-exempt because the aggregate value of exemptions will exceed the statutory cap on exemptions. Thus, there is, at a minimum, a triable issue of fact as to whether Debtor has intentionally sought to conceal assets that would be available to creditors if properly valued.

41.    Furthermore, the Debtor has concealed millions of dollars in jewelry from his creditors. In response to a subpoena issued by Vitol in this proceeding, Chubb Lloyd's Insurance Company of Texas ("**Chubb**") produced the Debtor's individual insurance policies.[73] The production included a 2020 jewelry rider showing the Debtor individually insured vast amounts of jewelry (the "**Jewelry Rider**").[74] The Jewelry Rider includes detailed descriptions of 148 pieces of jewelry along with the insured value of each piece. Based on the Jewelry Rider, Vitol believes that some or all of the jewelry may be community property that is properly considered part of the bankruptcy estate.[75] Despite having a significant amount of jewelry insured in 2020, the Debtor

---

[69] *See* Appraisal Report, Exhibit 24.

[70] *See* Debtor's Schedules, Exhibit 22.

[71] *See* Appraisal Report, Exhibit 24.

[72] *See* Debtor's Second Amended Schedules, [Docket No. 91].

[73] *See* Chubb Jewelry Rider, Brass BK Dep. Ex. 12, filed as **Exhibit 25**.

[74] *Id.*

[75] Texas law creates a presumption that property possessed by either spouse during the marriage is community property. Tex. Fam. Code § 3.003. Clear and convincing evidence is required  to rebut the strong presumption of community property. *Id.*; Tex. Fam. Code § 101.007; *see also Milbank v. Tomlin (In re Tomlin)*, Nos. 99-35175-BJH-7, 01-3458, 2003 Bankr. LEXIS 2295 (Bankr. N.D. Tex. Aug. 27, 2003) (determining that jewelry was deemed

initially disclosed only $23,705 worth of jewelry on his schedules.[76] The Debtor later disclosed $211,255 worth of jewelry via his Second Amended Schedules.[77]  Moreover, Vitol has identified at least one significant piece of jewelry that was acquired using funds from a bank account jointly held by the Debtor and his wife.[78] Based the presumption that such property is community property under the Texas law and the fact that the Debtor himself (and not his wife) is the named insured in the Jewelry Rider, there is a triable issue of facts as to whether Debtor concealed assets from his creditors.

### (7) _The Transfers were Not for Reasonably Equivalent Value_

42.    There is no evidence whatsoever that GCAC received any consideration or benefit from the Transfers. Instead, the Transfers represent only a dissipation in GCAC's assets. The loans to the Debtor and his mother are unwritten and evergreen loans - GCAC did not have any written agreements for these loans and there were no recorded repayment terms, due dates, or interest rates.[79] In short, GCAC received nothing in exchange for the Transfers.

### (8) _GCAC was Insolvent at the time of the Transfers_

43.    GCAC was insolvent at the time each of the Transfers was made. GCAC was

---

community property absent clear and convincing evidence to the contrary). Here, that presumption is already bolstered by the existence of a Jewelry Rider identifying more than $3.8 million in jewelry for which the Debtor is the sole named insured.

[76] _See_ Docket No. 19.

[77] _See_ Docket No. 85. The Jewelry Rider also provides additional evidence that the Debtor intentionally undervalued his personal property. For example, the Debtor scheduled a "Patek Philip watch – 30 years old" with a value of $6,000. The Jewelry Rider includes a "Patek Philippe & Co Watch, circa 1990" with an insured value of $19,210. The Debtor scheduled a "Frank Mueller Master banker watch" with a value of $5,000. The Jewelry Rider includes a "Franck Muller 'Master Banker' watch" with an insured value of $35,612. The large discrepancy between the scheduled values and the insured values indicates potential deception by the Debtor.

[78] IBC Bank Statement, IBC_0001997, attached as **Exhibit 12**.

[79] GCAC Depo 2020 87:14-88:6 ("Q. What -- there's no promissory note related to that loan, right? A. Correct. Q. What's the repayment date on that loan? A. It doesn't have a repayment date. Those loans never have. They've been advanced and paid back over 20 years. Q. No -- so let me get this straight. For the money that GCAC loaned you personally to pay for the construction of your golf vacation house, there was no promissory note, right? A. Correct. Q. There was no repayment date, correct? A. Correct. And you can't tell me what the interest rate is on that loan? A. I can tell you it's whatever the federally mandated interest rate was").

---

insolvent at June 30, 2017, at December 31, 2017, and at January 31, 2018, failing all three recognized tests of solvency at each date.[80] GCAC's balance sheets from June 30, 2017 through January 31, 2018 contain $6.6 million of assets identified as Investments/Loans in affiliated companies that have minimal or zero assets, negative book equity, zero revenues, and negative income before tax. These Investments/Loans in affiliated companies have been excluded from the GCAC solvency analysis as these affiliated companies do not demonstrate any ability to repay amounts reflected on GCAC's balance sheets.

44.     From July 1, 2017 through December 31, 2018, GCAC transferred a net $6.9 million to the Debtor and his mother.[81] The net amounts transferred to the Debtor and his mother were recorded as "Due from Shareholders" assets of GCAC and represented more than 70% of Consolidated GCAC's $8.9 million of total assets.[82] The amounts transferred to the Debtor and his mother took place during a period that Consolidated GCAC had negative book equity.

(9) *The Transfers occurred while Substantial Debt was being Incurred*

45.     The Transfers also occurred at a time when GCAC was incurring substantial debt. GCAC was acquiring asphalt using funding provided by Vitol.[83] The funds that GCAC was siphoning to the Debtor were payments received from asphalt purchasers - funds that should have been used to repay Vitol.[84] Thus, each of the Transfers to the Debtor and his mother caused GCAC to incur additional debt to Vitol.

46.     Having established at least nine of the eleven badges of fraud provided in *Husky*, the Court must determine (a) whether the Transfers were for the Debtor's benefit; and (ii) whether

---

[80] *See* Deetz Declaration, Exhibit 5.

[81] *See* Deetz Declaration, Exhibit 5.

[82] *See* Deetz Declaration, Exhibit 5.

[83] *See*, *e.g.,* email from M. Ruzek to E. Kuo dated 4/11/2018 (Vitol_00080065-66), Exhibit 3.

[84] *Id.*

the Debtor's actual fraud renders the Transfers nondischargeable.

**The Transfers were made for the Debtor's Benefit**

47.     It is self-evident that payments directly to the Debtor or to his personal creditors with no connection to GCAC are for the Debtor's personal benefit. Here, each of the Transfers was to the Debtor, the Debtor's individual creditors, or the Debtor's mother.

**The Transfers are NonDischargeable**

48.     Having demonstrated that the Transfers contain sufficient badges of fraud and that the Transfers were for the Debtor's personal benefit, the last inquiry is whether the Transfers are nondischargeable under the Bankruptcy Code. Under relevant Fifth Circuit law, having demonstrated that the Transfers were done with actual fraud and personally benefitted the Debtor, they are nondischargeable.[85] In the face of evidence that the Transfers were made with actual fraud, there is a genuine issue of material fact as to their nondischargeability that necessitates denial of summary judgment so that the parties may proceed to trial on the merits.

49.     Further, Vitol's fees and expenses incurred in pursuing this Adversary Proceeding are a nondischargeable obligation of the Debtor, as well as pre-judgment and post-judgment interest.[86]

## PRAYER

In light of the foregoing, Plaintiff respectfully prays that the Court deny the Debtor's Motion for Summary Judgment and grant Plaintiff any such other and further relief, at law or in equity, to which Plaintiff may show itself to be justly entitled.

---

[85] *Husky,* 567 B.R at 764 ("This Court is bound by Fifth Circuit precedent, and therefore does not need to make a finding that the Debtor directly received the $1,161,279.90 that he transferred out of Chrysalis's account; or, alternatively, make a finding that he indirectly benefitted from his transferring these monies out of Chrysalis's account. Rather, this Court need only make a finding the $1,161,279.90 transferred from Chrysalis's account to the accounts of the Debtor-Controlled Entities was done fraudulently by the Debtor—and this, the Court has already done.").

[86] *See Husky,* 567 B.R at 767.

Dated: **May 9, 2022.**                          Respectfully submitted,

By: */s/ Keith M. Aurzada*
    Keith M. Aurzada (SBN 24009880)
    Bradley J. Purcell (SBN 24063965)
    Lindsey L. Robin (SBN 24091422)
    **REED SMITH LLP**
    2501 N. Harwood, Suite 1500
    Dallas, Texas 75201
    T: 469.680.4200
    F: 469.680.4299
    kaurzada@reedsmith.com
    bpurcell@reedsmith.com
    lrobin@reedsmith.com

    and

    Michael H. Bernick (SBN 24078277)
    Mason W. Malpass (SBN 24109502)
    **REED SMITH LLP**
    811 Main Street, Suite 1700
    Houston, TX 77002
    T: 713.469.3834
    F: 713.469.3899
    mbernick@reedsmith.com
    mmalpass@reedsmith.com

    *Attorneys for Vitol Inc.*

## CERTIFICATE OF SERVICE

I certify that on **May 9, 2022**, a true and correct copy of the forgoing document was served via the Court's Electronic Case Filing (ECF) system to all counsel of record.

    */s/  Bradley J. Purcell*
    Bradley J. Purcell