# In the District Court of
# Harris County, Texas
# 295th Judicial District

## Gulf Coast Asphalt Company, LLC
## Plaintiff/Counter-Defendant,

## vs.

## Vitol Inc.
## Defendant/Counter-Plaintiff/Third-Party Plaintiff,

## vs.

## Arthur J. Brass and Trifinery, Inc.
## Third-Party Defendants

## REBUTTAL REPORT OF BOB BROXSON

Secretariat Advisors LLC

March 23, 2020

# Table of Contents

I. Introduction ........................................................................................................................... 3

II. Summary of Opinions........................................................................................................... 3

III. Qualifications ....................................................................................................................... 3

IV. Background .......................................................................................................................... 4

V. Rebuttal of Fuller Report ..................................................................................................... 5

    A. GCAC Benefited from the Mercuria Transaction ..................................................... 5

    B. Vitol's Cash Flow from Working with GCAC .......................................................... 6

    C. GCAC was Aware of and Directed Hedging Activity .............................................. 7

    D. Vitol had no Role in Purported Canadian Crude Deals............................................ 9

VI. Conclusion.......................................................................................................................... 11

## I. Introduction

1. My name is John Robert (Bob) Broxson. I have been retained by Reed Smith LLP ("Counsel") on behalf of Vitol Inc. ("Vitol") to provide my professional expertise and opinions in the referenced case and to respond to the expert report of David N. Fuller dated February 25, 2020 ("Fuller Report").

## II. Summary of Opinions

2. I re-affirm the opinions presented in my expert report dated February 21, 2020, and submitted on February 24, 2020 in which I provide the following opinions:

    a. Vitol and GCAC did not enter a joint marketing agreement.

    b. Vitol provided GCAC interim financing to purchase product and hedge price risk in relation to GCAC's trade of asphalt and other products. GCAC has failed to repay Vitol in full under the interim financing arrangement.

    c. GCAC owes no less than $14,793,947 to Vitol in damages related to GCAC's non-payment of funds advanced by Vitol as part of the interim financing arrangement.

3. Based on my review of the Fuller Report, I have reached the following opinions:

    a. The deal negotiated with Mercuria Energy Trading, Inc. ("Mercuria") provided terms that have benefited GCAC.

    b. The Fuller Report substantially agrees with my analysis that under an interim financing arrangement, GCAC owes Vitol approximately $14.8 million.

    c. GCAC was aware of Vitol's hedging and directed Vitol to place hedges, which resulted in a loss of $6,244,484.

    d. The purported Canadian Crude Deals discussed in the Fuller Report took place after GCAC and Mercuria entered into a Marketing Agreement, and there is no evidence Vitol had any role in these potential deals.

## III. Qualifications

4. I am a Managing Director in the Disputes and Forensic Investigations practice of Secretariat Advisors LLC ("Secretariat"). My business address is Two Allen Center, 1200 Smith Street, 16th Floor, Houston, Texas 77002.

5. I hold a Master of Business Administration degree from the C.T. Bauer College of Business, University of Houston and a Bachelor of Business Administration in Management degree from Evangel University.

6. I have been actively involved in the energy industry since 1981, primarily focusing on commodity marketing, trading, and midstream commercial development. My experience

      includes knowledge regarding the formation of companies and the development of joint ventures in commodity trading and project development.

7. Over the course of my career, I have held senior executive positions in the energy industry. I have provided commercial and strategic advice to energy clients. I have been recognized as an energy industry expert and assisted clients and their counsel in various types of litigation and arbitration matters. I have testified in United States federal courts, state courts, Canadian Provincial Courts as well as arbitration forums.

8. In addition, I serve as an adjunct professor in the Global Energy Management Master of Business Administration program at the University of Houston, C.T. Bauer College of Business where I teach courses in midstream energy finance.

9. I have relied on the documents that have been made available to me and that have been produced in this matter. A listing of documents I relied upon is found in Appendix A. This report and all supporting analyses have either been prepared by me or staff working pursuant to my direction and supervision. Secretariat is compensated for my time in this matter at an hourly rate of $650. No part of Secretariat's compensation is dependent on the outcome of this matter.

## IV. Background

10. In February of 2016, GCAC entered into a Joint Marketing Agreement ("RIO JMA") with Rio Energy International, Inc. ("Rio"). The purpose of the RIO JMA was to trade asphalt and related products and "share all costs and profits and losses equally."[1] Before the end of the initial term of the RIO JMA, Rio notified GCAC that it wanted out of the agreement. GCAC agreed and started looking for a replacement party.[2]

11. In early 2017, GCAC through its President Arthur ("A.J.") Brass approached Vitol about a potential business venture with GCAC.

12. During negotiations, GCAC and/or Mr. Brass proposed forming a new entity. Thus, several drafts of a proposed agreement referenced "NewCo". On July 3, 2017, Mr. Brass registered Hermosa Energy, LLC with the Texas Secretary of State, which GCAC represented to be the "NewCo" entity.

13. As Vitol and GCAC/NewCo continued negotiating material terms of their proposed agreement, Vitol took over Rio's inventory position as of July 1, 2017 due to pressure from Rio, which wanted to exit the RIO JMA.

14. In mid-July of 2017, Vitol notified GCAC/Mr. Brass that Vitol would be prohibited from entering a proposed JMA due to an existing contractual agreement involving another Vitol venture in the asphalt business.[3]

---

[1] Rio GCAC JMA (VITOL_00078952)
[2] Deposition of Arthur Brass on June 28, 2018 (Pgs. 62-63)
[3] Deposition of Arthur Brass on June 28, 2018 (Pgs. 33-34) and discussion with Eric Kuo on July 30, 2019

15. Although it was not under any contractual agreement to do so, Vitol offered to provide interim financing to GCAC. Between July 2017 and December 2017, Vitol extended interim financing to GCAC for dozens of transactions, which are discussed below.

16. GCAC made three payments to Vitol totaling $16,634,401 as partial repayment of the interim financing, but GCAC did not repay all amounts owed to Vitol.

17. Effective January 12, 2018, GCAC entered a Marketing Agreement with Mercuria Energy Trading, Inc. ("Mercuria") after several months of negotiations.

18. A Termination and Release Agreement executed by GCAC and Rio reflects that the RIO JMA remained in effect and was not terminated until January 12, 2018.

## V.  Rebuttal of Fuller Report

19. Mr. David N. Fuller, the expert representing GCAC, provides a summary of opinions which contains calculations under two scenarios; Vitol was providing financing, and Vitol and GCAC shared 50/50 interest in the outcome. Under each scenario, Mr. Fuller performs two calculations.

    a. The first calculation is Vitol's cash flow from working with GCAC related to asphalt sales and purchases.

    b. The second calculation is GCAC's alleged future lost profits from forgone opportunities related to Canadian crude oil sales, due to Vitol and GCAC ceasing to work together.

20. Mr. Fuller does not provide any support or evidence to illustrate the calculations he presents. Further, Mr. Fuller provides an unsupported calculation that eliminates Vitol's hedging losses incurred on GCAC's behalf. Mr. Fuller does not provide any support for the calculations he has provided.

### A.  GCAC Benefited from the Mercuria Transaction

21. In this matter, GCAC alleges to have been damaged by Vitol. In his expert report, Mr. Fuller states, "I understand that GCAC was eventually able to engage with a new partner, but at a negotiating disadvantage which lead to less advantageous terms."[4] This opinion is not supported as GCAC has actually benefited as a result of its deal with Mercuria.

22. For example, under the terms of the Marketing Agreement between Mercuria and GCAC ("Mercuria Agreement"), Mercuria absorbs 100% of any losses related to transactions while only retaining a portion of any profits. The Mercuria Agreement states, "Losses for any fiscal year or Stub Year, as the case may be, shall be **fully borne by Mercuria**… (emphasis added)"[5]

---

[4] Expert Report of David N. Fuller dated February 25, 2020; Page 4
[5] GCAC0001-128 (Page 9)

23. GCAC benefited from the fact Mercuria absorbed 100% of the losses compared to Mr. Fuller's theory that "the parties shared a 50/50 interest in the outcome." Further, GCAC is better off under the Mercuria Agreement than it was under the Joint Marketing Agreement between GCAC and Rio, which would have required the parties to "share all costs and profits and losses equally."

24. It is my understanding that due to variations in market conditions, the trades under the Mercuria Agreement have resulted in net losses. In the following excerpt from his deposition, Mr. Brian Falik, Chief Investment Officer at Mercuria, verifies this point:[6]

    > Q: Generally how would you describe how the GCAC and Mercuria Marketing Agreement is performing today?
    >
    > A: Terribly.
    >
    > Q: Why do you say that?
    >
    > A: We lost money.
    >
    > Q: And do you know how much?
    >
    > A: It fluctuates daily with market (sic) to market.
    >
    > Q: And could you give an approximation over the life of the deal as to how much money Mercuria lost?
    >
    > A: I would say it's between three and nine million dollars, but I don't have a specific number.

25. Additionally, GCAC received guaranteed income as a result of entering into the Mercuria Agreement. In conjunction with the Mercuria Agreement, GCAC entered into a Consulting Agreement with POTAC, LLC dated January 12, 2018, which provides $500,000 per year to GCAC through January 31, 2021.[7] This is different than any proposed agreement that was being negotiated with Vitol.

B. Vitol's Cash Flow from Working with GCAC

26. In his report, Mr. Fuller agrees with my conclusion that under the financing agreement, GCAC owes Vitol an amount in excess of $14 million. As I discussed in my earlier report, GCAC has caused Vitol damages of at least $14,793,947. These damages include costs incurred by Vitol on behalf of GCAC as part of the interim financing agreement, plus a TVM (interest) amount.

---

[6] Deposition of Mr. Brian Falik on December 17, 2019 Page 32-33
[7] METI0000563-574

| Summary of Vitol's Damages | |
|---|---|
| **Particulars** | **Amount ($)** |
| Product Costs | 3,769,093 |
| Storage Related Costs | 2,632,253 |
| Deal Related Costs | 1,339,629 |
| Hedging | 6,244,480 |
| Interest | 351,012 |
| Credit Risk | 200,890 |
| Freight Titanio Delivery Deal #3 | 256,590 |
| **Total** | **14,793,947** |

27. Mr. Fuller calculates the amount owed to Vitol by GCAC under a financing arrangement to be $14,320,900, which is $473,047 less than the damages I have calculated. A large portion of this difference is a result of Mr. Fuller not including amounts for Credit Risk or the Freight Titanio Delivery Deal #3. Mr. Fuller did not provide an explanation for why he excluded these costs, nor why the figures he used are different than those presented in my original report.

| Summary of Differences | | | |
|---|---|---|---|
| | **Broxson** | **Fuller** | |
| **Particulars** | **Amount ($)** | **Amount ($)*** | **Difference ($)** |
| Product Costs | 3,769,093 | 3,742,900 | 26,193 |
| Storage Related Costs | 2,632,253 | 2,632,300 | (47) |
| Deal Related Costs | 1,339,629 | 1,193,400 | 146,229 |
| Hedging | 6,244,480 | 6,431,700 | (187,220) |
| Interest | 351,012 | 320,700 | 30,312 |
| Credit Risk | 200,890 | - | 200,890 |
| Freight Titanio delivery Deal #3 | 256,590 | - | 256,590 |
| **Total** | **14,793,947** | **14,321,000** | **472,947** |

\* Fuller Report Schedule B.1

C. GCAC was Aware of and Directed Hedging Activity

28. What is a hedge? "A hedge involves establishing a position in the futures or options market [financial instrument] that is equal and opposite to a position at risk in the physical market. For instance, a crude oil producer who holds (is "long") 1,000 barrels of crude can hedge by selling (going "short") one crude oil futures contract [financial instrument]."[8] This definition contemplates that if there is a loss on the physical commodity (i.e. a reduction or increase in the price of the underlying commodity), the financial instrument typically offsets this loss.

---

[8] www.kisfutures.com › GuideEnergyHedging_NYMEX

29. In his summary of opinions, Mr. Fuller presents calculations for Vitol's cash flow from working with GCAC ranging from ($11.3) million to ($14.3) million depending on whether the trier of fact finds Vitol was providing financing or if Vitol had a 50% interest. Neither of these opinions excludes the losses from hedging activities.

30. Later in his report, Mr. Fuller presents a separate calculation for Vitol's cash flow from working with GCAC that does not include hedging losses. While he does not provide an opinion on why removing the hedging losses is appropriate, he states, "it's my understanding that Vitol has not provided documentation regarding the hedge strategy or documents demonstrating that the listed transactions were in fact related to the Venture."[9] Mr. Fuller does not provide a single example of a hedge that was placed that was not directed by GCAC. Nor does Mr. Fuller provide any evidence or examples of any hedges that were disputed by GCAC, despite having awareness of hedges taking place.

31. Moreover, Mr. Fuller ignores the numerous confirmation texts and communications from GCAC to Vitol directing hedging activity subsequent to GCAC's physical asphalt trades. Appendix D to my expert report dated February 21, 2020 details numerous examples of GCAC communications to Vitol to place hedges and subsequent confirmations from Vitol to GCAC detailing the hedges that were placed. This clearly illustrates GCAC was directing Vitol on when to place hedges and that they understood that hedging activity was being performed at GCAC's direction.

32. While Mr. Fuller references a "hedging strategy," employed by Vitol, he provides no evidence in which GCAC questions any of the financial transactions Vitol used to hedge the physical sales and purchases of asphalt made by GCAC. There is also no evidence presented indicating GCAC did anything but send along its physical trade information with the expectation Vitol would execute financial trades to hedge the physical transaction executed by GCAC.

33. Moreover, the hedges Vitol placed were consistent with industry practice. As I discussed in my earlier report, it is common in the energy industry to hedge in order to guard against volatility. It is my experience that energy traders balance their book by the end of each day, meaning they do not typically leave open positions for any period of time (i.e. unhedged trades).

34. Typically, when there is a gain on physical sales, there will be a corresponding loss on the hedge. Patrick Perugini, GCAC's former head trader, agrees:[10]

---

[9] Expert Report of David N. Fuller dated February 25, 2020; Page 7
[10] Deposition of Patrick Perugini on June 29, 2018; Page 26

> Q: If you're up -- is it true that if you're up on your physical trades you're going to be losing money, generally speaking, on your hedges?
>
> A: It's not always the case but –
>
> Q: Typically?
>
> A: Yes.

35. Further, it is the customary and normal practice in the industry to hedge physical asphalt transactions using the same methodologies employed by Vitol and GCAC here. Mr. Fuller provides no alternative to what he believes a proper hedging strategy should have been.

### D. Vitol had no Role in Purported Canadian Crude Deals

36. Mr. Fuller presents a calculation of damages for lost profits related to potential Canadian Crude Deals ("Potential Canadian ARB Concept"). Mr. Fuller states that he "calculated the future lost profits from the Canadian ARB Deals that GCAC could have pursued, but was unable to enter due to Vitol's refusal to work with CGAC."[11] Mr. Fuller provides no basis for this claim and does not provide a single piece of evidence Vitol in any way hindered GCAC's ability to pursue these concepts.

37. The first correspondence regarding a Potential Canadian ARB Concept occurred on August 12, 2017[12], one month after Vitol informed GCAC they would not be able to move forward with a Joint Marketing Agreement. At the same time, GCAC was already negotiating with Mercuria about their potential relationship, discussing terminating their relationship with Vitol and pitching the concept of Canadian ARB to Mercuria.

38. In a memo dated August 13, 2017 GCAC states, "Mgmt believes there may be a short window of opportunity to terminate its current relationship with Vitol in order to engage in a long-term strategic relationship with Mercuria."[13] This memo also lists "Canadian crude by rail" as one of several different "Other Growth Opportunities."

39. On November 11, 2017, Michael Myhra with Mercuria emailed Arthur Brass to learn more about Potential Canadian ARB Concepts.[14] While Vitol was included on some correspondence regarding a Potential Canadian ARB Concept, the last communication in which Vitol was included on was January 31, 2018.[15]

40. Mr. Fuller identifies two separate Potential Canadian ARB Concepts but has provided no evidence that these two separate Potential Canadian ARB Concepts are not simply continued negotiations of the same potential business development concept. Discussions between Mercuria and GCAC regarding the Potential Canadian ARB Concept began on August 12, 2017[16] and extended through at least October 18, 2018[17], and to my knowledge

---

[11] Expert Report of David N. Fuller dated February 25, 2020; Pages 4-5
[12] GCAC009530
[13] GCAC009533
[14] GCAC009557
[15] GCAC009597
[16] GCAC009530
[17] GCAC009839

no deal was ever executed. Further, Mr. Fuller has provided no evidence Vitol played any role in GCAC's and Mercuria's inability to get a deal negotiated. In fact, the documents he relies upon reference issues with other parties, not Vitol, as large contributing factors:

a. In an email dated January 9, 2018, Patrick Perugini (GCAC) wrote to Eric Kuo (Vitol), "If and when we ever get quotes from the railroads, this is where I think it is."[18]

b. In an email dated January 17, 2018, Patrick Perugini (GCAC) wrote to Bruce Greenbank (Vitol) and Erik Kuo (Vitol), "We are waiting on the railroads."[19]

c. In an email dated April 13, 2018, Daniel House (Mercuria) wrote to Patrick Perugini (GCAC) and Timothy Holan (Mercuria), "This is not a priority for Citgo. They have not shown any interest in terming this up."[20]

41. The first purported opportunity Mr. Fuller identifies cites an email dated February 23, 2018 to describe the details of the potential transaction.[21] This email is from GCAC to Mercuria and begins, "Constantly getting new info on rates[sic] Updated numbers, railroads are more greedy than expected." The tone of this update indicates the details of a potential transaction were still evolving and there was no deal in place to be executed. It is also important to note there are multiple references in this update to "Mercuria/GCAC" and not a single mention of Vitol.

42. Mr. Fuller's analysis for this purported opportunity uses the proposed terms as if they were final and ready to be executed. This is not supported by the evidence. Mr. Fuller states the potential transaction "would involve leasing 400 rail cars at $700.0 per car."[22] However, the document he is relying on[23] specifies "roughly 400 cars" at an expected rate of "$600-800." Mr. Fuller is making assumptions in his analysis without providing any support for using that quantity and rate in his calculation. Additionally, this document lists potential next steps including setting up a meeting to "discuss rates." It is clear the terms Mr. Fuller is relying on for this calculation were not final and required further negotiations.

43. A second purported opportunity Mr. Fuller identifies (assuming it is not a continuation of the first opportunity) is based on an email chain between Mercuria and CIT, a rail lessor, dated between May 30, 2018 and June 1, 2018.[24] Negotiations for this potential opportunity occurred several months after GCAC entered into its Mercuria Transaction, and once again there is no mention of Vitol. This email also indicates Mercuria was actively involved in this potential opportunity, but the issues it was facing with CIT were putting the "deal in jeopardy."

---

[18] GCAC009574
[19] GCAC009576
[20] GCAC009604
[21] GCAC009600
[22] Expert Report of David N. Fuller dated February 25, 2020; Page 9
[23] GCAC009600
[24] GCAC009695

44. As with the first purported opportunity he describes, the evidence referenced by Mr. Fuller does not support the details of his analysis. Mr. Fuller states, "the second deal would involve leasing 600 rail cars at $545.0 per car."[25] However, the document he relies on[26] states, "CIT has pulled their offer back." The document further states, "the offer has changed from 814 railcars at $545/18 months to 300 railcars at $695/36 months." Further correspondence regarding the "Rail deal" in July 2018 indicates that potentially only 110 railcars were available.[27] Once again, it is clear the terms cited by Mr. Fuller were not final, nor ready to be executed, and negotiations were still ongoing.

45. Mr. Fuller makes no reference to how such Potential Canadian ARB Concepts are related to the GCAC's primary business – asphalt trading. Further, Mr. Fuller makes no reference nor provides any factual support as to why Vitol should be obligated to participate or provide financing for a potential business development concept without the mutual agreement of both parties.

46. In my experience, it is common where marketing agreements exist for parties to have mutual agreement before a product is purchased or sold. For example the Rio JMA states, "Upon the **prior mutual agreement** of the parties as to quantity, specifications, price and frequency of purchase, Rio will use its commercially reasonable efforts to purchase Products for delivery to the Terminals, and arrange, as necessary, for the blending of the Products. (emphasis added)"

47. Similarly, it is common under financing agreements, such as the one between Vitol and GCAC, for parties to require mutual agreement with regard to alternative activities that could be financed. For example, the interim financing structure Arthur Brass emailed to Vitol contained the following language for "GCAC/Non-Asphalt Products", "Vitol and GCAC JV other deals as **per mutual agreement**. (emphasis added)"

48. The potential opportunities referenced in Mr. Fuller's report would have required the mutual agreement of the parties. Mr. Fuller did not identify any evidence Vitol agreed to participate in these potential concepts or was obligated to do so. In addition, Vitol was never presented with any Potential Canadian ARB Concept that was fully negotiated and ready for execution.

## VI. Conclusion

49. These facts support the contention that there are no damages suffered by GCAC. Rather, Vitol is the only party damaged.

50. The hedging activity performed by Vitol was at the direction of GCAC and represents common hedging practices for asphalt trading.

---

[25] Expert Report of David N. Fuller dated February 25, 2020; Page 9
[26] GCAC009695
[27] GCAC009793

51. GCAC did not enter into a joint marketing agreement with Vitol. Instead, Vitol provided GCAC interim financing for product purchases and to hedge price risk. GCAC has damaged Vitol by not paying the entirety of what is owed.

52. GCAC has not been damaged by Vitol. GCAC benefitted from the Marketing Agreement with Mercuria. Vitol had no role in the Potential Canadian ARB Concept. The discussion for these potential business development concepts extended through at least October 2018 and no terms were ever finalized with Vitol, or to my knowledge, any other party.

53. My conclusions and opinions are based on my industry experience and knowledge of the subject matter and the information and documents made available to me in this matter to date.

54. To the extent additional documents and information are made available and I am asked to review them, I reserve the right to amend my opinions and this report accordingly.

_____
Bob Broxson
March 23, 2020

APPENDIX A

## Bob Broxson Documents Relied Upon

**Legal Documents**

Gulf Coast Asphalt Company, LLC's original petition against Vitol, Inc. dated May 10, 2018.

Gulf Coast Asphalt Company, LLC's plea in abatement and original answer in response to Vitol, Inc.'s original petition dated June 08, 2018

Defendant Arthur J. Brass's plea in abatement and original answer in response to Vitol, Inc.'s original petition dated June 11, 2018

Defendant Vitol, Inc.'s original answer in response to the original petition filed by Plaintiff Gulf Coast Asphalt Company, LLC dated June 18, 2018

Plaintiff Gulf Coast Asphalt Company, LLC's first amended petition against Vitol, Inc. dated November 15, 2018

Defendant and Counterclaimant Vitol, Inc.'s notice of non-suit without prejudice dated January 4, 2019

Defendant and Counterclaimant Vitol, Inc.'s first amended answer and counterclaims in response to the first amended petition by Gulf Coast Asphalt Company, LLC dated January 17, 2019

Gulf Coast Asphalt Company, LLC's second amended petition against Vitol, Inc. dated February 21, 2019

Vitol, Inc.'s second amended counterclaims and third-party petition against Gulf Coast Asphalt Company, LLC and third party Defendants dated September 12, 2019

**Depositions and Exhibits**

Arthur Brass

 Arthur Brass amended deposition notice dated June 17, 2019

 Transcript of the Testimony of Arthur Brass dated June 28, 2018

 Exhibit No. 1 to 10, Arthur Brass deposition

 Reporter certification to the oral and videotaped deposition of Arthur J. Brass dated June 28, 2018

Brain Falik

 Deposition transcript of Brain Falik dated December 17, 2019

 Exhibit No. 30 to 47, Brain Falik deposition

APPENDIX A

Jason Goldstein

    Transcript of oral and videotaped deposition of Jason Goldstein dated May 16, 2019

    Exhibit No. 18 to 29, Jason Goldstein deposition

Patrick Perugini

    Transcript of uthe testimony of Patrick Perugini dated June 29, 2018

    Exhibit No. 11 to 17, Patrick Perugini deposition

    Reporter's Certificate on oral videotaped deposition of Patrick Pergugini dated June 29, 2018

**Expert Reports and Exhibits**

Expert Report of David N. Fuller dated February 25, 2020 and Exhibits

**Bates Numbered Documents**

GCAC0001

GCAC000761-775

GCAC000870-888

GCAC001068-1069

GCAC004445

GCAC004631-632

GCAC004666

GCAC004694-695

GCAC005167-168

GCAC005427-428

GCAC005439-444

GCAC005591-593

GCAC005781-783

GCAC006107

GCAC006121-122

GCAC006224-227

GCAC006719

GCAC007009-41

APPENDIX A

GCAC007237-243

GCAC009521-842

METI0000001

METI0000014

METI0000072

METI0000081-90

METI0000092-304

METI0000383

METI0000384

METI0000396

METI0000402

METI0000436

METI0000470

METI0000543-574

METI0001021-1167

METI0001495-1500

METI0001536-538

METI0001572-573

METI0001820-828

Rio-GCAC Joint Marketing Agreement - Vitol_00078949 - 962

VITOL_00000194

VITOL_00000209

VITOL_00000304

VITOL_00000791

VITOL_00000794

VITOL_00000801

VITOL_00000808

VITOL_00000819

VITOL_00000821-827

VITOL_00001083-085

VITOL_00001846-854

APPENDIX A

VITOL_00001859

VITOL_00002127-130

VITOL_00002315-316

VITOL_00002333

VITOL_00002373-375

VITOL_00003198-199

VITOL_00004228-231

VITOL_00004612

VITOL_00004740

VITOL_00004918-930

VITOL_00006463

VITOL_00007596

VITOL_00007640

VITOL_00009088-090

VITOL_00009172

VITOL_00009177

VITOL_00009562

VITOL_00009572-588

VITOL_00010851-898

VITOL_00012352

VITOL_00074288

VITOL_00074368-369

VITOL_00074833-836

VITOL_00075544-547

VITOL_00076335-339

VITOL_00076792

VITOL_00078117

VITOL_00078124

VITOL_00078124

VITOL_00080066

VITOL_00081436-465

APPENDIX A

VITOL_00083883-4997

**Other**

Public Company Filings

Hermosa Energy, LLC – Documents filing history

Hermosa Energy, LLC – Certificate of formation of Limited Liability Company

Hermosa Energy, LLC – Tax account status as of January 11, 2019

Articles, Publications and Text Books

Energy Risk: Valuing and Managing Energy Derivatives, second edition authored by Dragana Pilovic

A Guide to Energy Hedging published by New York Mercantile Exchange.

Oil Traders Move into Bitumen Market authored by Rakesh Upadhyay, dated July 19, 2016.