United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 21, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-60025** |
| **ARTHUR JACOB BRASS,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **VITOL, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 21-06006** |
| | § | |
| **ARTHUR JACOB BRASS,** | § | |
| | § | |
| Defendant. | § | |

### JUDGMENT AND ORDER[1]
### (RE: DOCKET NO. 10)

  Vitol, Inc. filed a complaint to determine the dischargeability of a $10 million debt against Arthur Brass under Sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. Based on the evidence and applicable law, $3,769,093.52 is nondischargeable under Section 523(a)(2)(A) and Section 523(a)(6).

---

[1] If any findings of fact in this Judgment and Order may be treated as conclusions of law, they are also deemed conclusions of law. If conclusions of law may be treated as findings of fact, they are also deemed findings of fact.

## **Background**

Before this case started, Brass was the president of Gulf Coast Asphalt Company ("**GCAC**").[2] GCAC marketed and traded asphalt for sale to third parties. GCAC was owned equally between Brass's mother and Trifinery, Inc.[3] Brass owned Trifinery, thus giving him a 50% beneficiary interest in GCAC.[4]

Vitol is a Houston based energy and commodities company that ships and trades crude oil and related products in the United States.[5] Vitol is one of many entities under the umbrella of what is referred to here as the Vitol Group.[6] Around November 2016, Vitol was looking for a business partner in the finished asphalt market.[7] So it began discussions with GCAC about starting a joint venture to buy and sell asphalt through a jointly owned entity. This was good news for GCAC because it was also looking for a new business partner during this time.[8]

Brass, on behalf of GCAC, and Eric Kuo (a fuel trader), on behalf of Vitol, worked on the potential joint venture deal. Despite months of negotiating and drafts reviewed by lawyers, the parties never finalized and executed a joint venture agreement.[9] Around July/August 2017, representatives of the Vitol Group informed Kuo and other Vitol employees about a potential conflict. A member of the Vitol Group called VALT (Vitol Asphalt Limited Trading) was already party to an agreement with a third party that contained a global noncompete clause about the sale of asphalt.[10] A Vitol/GCAC joint venture could potentially breach the VALT noncompete.

---

[2] Sept. 16 Trial Tr., Adv. No. 21-06006, Docket No. 161, 176:2–8.

[3] *Id.*, 185:11–186:1.

[4] *Id.,* 186:2–3.

[5] Sept. 1 Trial Tr., Adv. No. 21-06006, Docket No. 148, 8:18–9:23.

[6] *Id.,* 9:15-23; 38:10–11.

[7] Sept. 7 Trial Tr., Adv. No. 21-06006, Docket No. 145, 35:6–7.

[8] GCAC was a joint venture partner with a commodities firm that wanted to exit the joint venture. Sept. 16 Trial Tr., 186:15–187:10.

[9] Sept. 7 Trial Tr., 47:18–21; 192:11–18.

[10]*Id.,* 48:13–49:5.

Representatives of Vitol contemplated several options to continue a business relationship with GCAC and Brass.[11] But ultimately the Vitol/GCAC joint venture discussions stopped.[12] This was bad news for GCAC because at the beginning of August it had a negative $55,853.13 balance in its operating account, no cash in its payroll account, and $3,207.11 in its sales account.[13] Brass also had very little personal cash during this time.[14]

Ultimately, rather than pursuing a joint venture deal, Vitol agreed to serve as a financing partner for GCAC.[15] Kuo and Brass exchanged bullet points about a potential financing structure and spoke about repayment terms.[16] Vitol and GCAC never executed a formal written contract to memorialize their agreement. Brass believes that the parties operated under an informal joint venture. But that's not accurate. Rather, the evidence demonstrated that the parties generally operated under the following financing arrangement:

1. GCAC would inform Vitol about a deal with a third party;
2. Vitol would purchase product and title it in its own name;
3. Vitol, through Kuo, would hedge the deal;[17]
4. Vitol would "sell" the product to GCAC (GCAC did not have cash to buy product. So Vitol effectively loaned/financed GCAC the purchase price for the product.);
5. GCAC would sell the product to the third party;
6. GCAC would receive the sale proceeds, and then was supposed to repay Vitol[18] for—well Vitol and Brass/GCAC disagree on this point.

Vitol believes GCAC had to repay sale proceeds, any losses on hedges, and deal related storage and transportation expenses.[19] Kuo and Brass spoke about these financing terms. Kuo also believes that Brass assured him GCAC would pay Vitol according to these terms.[20] Brass disagrees.

---

[11]*Id.*, 226:3–15; Vitol Ex. 14.

[12] Sept. 7 Trial Tr., 50:4–12.

[13] Vitol Ex. 124, at Bates Nos. Debtor000303, Debtor000505, and Debtor000054.

[14] Vitol Ex. 75, at Bates No. IBC_0002044 (showing Brass had about $1,800 in his personal account at the beginning of August 2017).

[15] Sept. 7 Trial Tr., 58:25–59:1.

[16] Vitol Ex. 14; Sept. 7 Trial Tr., 64:25–65:2.

[17] Vitol was responsible for all hedges and carried them on its books. Sept. 16 Trial Tr., 151:12–15.

[18] Vitol Exs. 12, 18, 19–23; Sept. 7 Trial Tr., 58:25–59:8.

[19] Sept. 7 Trial Tr., 69:22–70:6.

[20] *Id.*, 64:25–65:12; 70:19–25.

Vitol eventually informed Brass and GCAC that it would only finance deals through the end of 2017.[21] GCAC repaid some outstanding debt between August 2017 and January 2018. In fact, GCAC made five payments to Vitol or for Vitol's benefit totaling $18,431,603.48 during this time.[22] Vitol provided GCAC and Brass an accounting reconciliation in early 2018 showing that GCAC owed Vitol about $15 million.[23] The reconciliation listed about $3.7 million for unremitted sales proceeds, about $6.2 million for losses on Vitol hedges, and the remainder for transportation and related expenses.[24] More importantly, Kuo testified that GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5-$8 million for hedging losses, and the rest for deal related expenses.[25] GCAC's records also listed an approximately $14.9 million contingent debt to Vitol on its financial statements and 2017 tax return.[26]

GCAC ultimately could not repay Vitol because Brass was secretly transferring cash out of GCAC.[27] Brass controlled GCAC's spending.[28] If Brass wanted cash from GCAC there was no internal control or authorization required. He believed he could take cash from GCAC for any reason.[29] Brass regularly transferred cash out of GCAC for his direct personal benefit through undocumented loans from GCAC.[30] Sometimes he reimbursed GCAC for loans.[31] But starting around August 2017—when GCAC started receiving proceeds of the financing arrangement with Vitol—Brass started siphoning an alarming amount of cash out of GCAC for his personal benefit.[32] He was spending cash on, among other things, a

---

[21] *Id.*, 72:6–12.

[22] Vitol Ex. 124, at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25).

[23] Sept. 7 Trial Tr., 110:17–22; 115:15–21; 116:17–25; Vitol Ex. 54.

[24] Vitol Ex. 54.

[25] Sept. 16 Trial Tr., 157:16–19; 160:17–165:4.

[26] *See, e.g.*, Vitol Exs. 81-174, at 8; 81-181 (GCAC Dec. 2017 and 2018 Consolidated Income Statements); 100, at 42 (2017 tax return).

[27] *See, e.g.*, Vitol Ex. 124, at Bates Nos. Debtor000108–Debtor000176.

[28] Sept. 16 Trial Tr., 183:19–185:10.

[29] *Id.*, 185:3–10.

[30] *See, e.g.*, Vitol Ex. 124, at Bates Nos. Debtor000021, Debtor000052, Debtor000060, Debtor000075 (transfers to Arthur Brass); Debtor000069, Debtor000087, Debtor000101 (transfers to Joyce Brass).

[31] *See, e.g.*, *id.*, at Bates No. Debtor000031.

[32] *Id.,* at Bates Nos. Debtor000052–Debtor000053; Debtor000068–Debtor000079.

multi-million dollar second home[33] and expensive jewelry.[34] Brass transferred about $6 million from GCAC between July 2017 through December 2018, and about $1 million in 2019.[35]

Brass and Kuo regularly communicated about the debt repayment. But around March/April 2018 Kuo realized Brass and GCAC were not repaying Vitol.[36] In May 2018, while Brass kept transferring cash,[37] GCAC went on the offensive by starting a lawsuit against Vitol in Harris County District Court.[38] Vitol counterclaimed and added third-party claims against Brass and Trifinery.[39] Vitol alleged, among other things, that Brass fraudulently stole about $15 million financed to GCAC.[40] The parties eventually settled before trial by entering into a Second Confidential Settlement Agreement and Mutual Global Release.[41] The Settlement Agreement provided that Brass, GCAC, and Trifinery were jointly and severally liable to Vitol for $10 million.[42] The Settlement Agreement included an Agreed Final Judgment for $10 million, which was later approved by the state court in November 2020.[43]

No party ever paid Vitol. Instead, Brass filed a voluntary chapter 7 case in March 2021. GCAC and Trifinery also started separate chapter 7 cases in this District.[44] In July 2021, Vitol filed a complaint to determine the dischargeability of

---

[33] *Id.*, at Bates No. Debtor000054; Sept. 16 Trial Tr., 224:11–226:7.

[34] Vitol Exs. 124, at Bates Nos. Debtor000088–Debtor000089; 75, at Bates No. IBC_0000061 (Dec. 2017 payment to jeweler for $665,105.85); Sept. 22 Trial Tr., Adv. No. 21-06006, Docket No. 165, 63:8–64:1.

[35] Vitol Exs. 81-174; 81-181; 124 at Bates Nos. Debtor000419, Debtor000423, Debtor000198–Debtor000200, Debtor000207–Debtor000212, Debtor000215–Debtor000219, and Debtor000223. In 2019, at least $100,000 was also transferred to Brass's mother, Joyce, as well as $110,000 to his sister, Sandra.

[36] *See* Brass Ex. 23, at 44–60.

[37] Vitol Ex. 124, at Bates Nos. Debtor000136–Debtor000139.

[38] Vitol's First Am. Compl., Adv. No. 21-06006, Docket No. 10; Brass's Am. Answer, Adv. No. 21-06006, Docket No. 27.

[39] Vitol Ex. 86.

[40] *Id.*, at 4–5.

[41] Joint Pre Trial Statement, Adv. No. 21-06006, Docket No. 106, at 8.

[42] *Id.*

[43] Vitol Ex. 89.

[44] *In re Gulf Coast Asphalt Co., LLC*, Case No. 21-60024, Bankr. S.D. Tex.; *In re Trifinery, Inc.*, Case No. 21-60023, Bankr. S.D. Tex.

debt and a first amended complaint in October 2021.[45] Vitol reiterated its state court allegations that Brass took money Vitol financed to GCAC and used it for personal purposes.[46] Vitol also alleged that Brass never paid—and never intended to pay—the settlement amount and requested an order stating that the $10 million debt is nondischargeable under Sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.[47] Brass moved for summary judgment on each of Vitol's claims.[48] The Court granted summary judgment on Vitol's claim under Section 523(a)(4) (fraud while acting in a fiduciary capacity) and denied summary judgment on the remaining claims.[49] The parties then held a multi-day trial that included testimony from Miguel Loya (former Vitol CEO), Eric Kuo (Vitol fuel trader), Gene L. Deetz (valuation expert), and Brass.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Nondischargeability under Sections 523(a)(2)(A), (4), (6)

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

### Section 523(a)(2)(A)

A debt is nondischargeable under Section 523(a)(2)(A) if it is for money obtained by "false pretenses, a false representation, or actual fraud." False pretenses, false representation, and actual fraud are common law terms and require separate proof requirements. *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001). Vitol argues the $10 million debt is

---

[45] Adv. No. 21-06006, Docket Nos. 1 and 10 (Vitol's Original and First. Am. Compl.).

[46] Vitol's First Am. Compl., ¶¶ 6–11.

[47] *Id.*, ¶¶ 14–15, 22–38.

[48] Mot. Summ. J., Adv. No. 21-06006, Docket No. 58.

[49] Summ. J. Order, Adv. No. 21-06006, Docket No. 79.

nondischargeable based on false representations and actual fraud. The Court finds that there is not sufficient proof of false representations, but there is actual fraud.

## A.     False Representations

To prove a false representation, a debtor must have made (1) a knowing and fraudulent falsehood, (2) describing past or current facts, that is (3) relied on by the other party. *See Jacobson v. Ormsby (In re Jacobson)*, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. 2007). "'A misrepresentation is fraudulent if the maker ... knows or believes ... the matter is not as' represented, or 'does not have the confidence in the accuracy of his representation' as stated or implied, or 'knows ... he does not have the basis for his representation' as stated or implied." *Mercer*, 246 F.3d at 407 (citation omitted). A debtor's promise about a future action may satisfy Section 523(a)(2)(A) if, at the time of the representation, the creditor can show that the debtor had no intention to fulfill it. *See e.g.*, *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992). Finally, the reliance standard for false representations is "justifiable reliance." *See Field v. Mans*, 516 U.S. 59, 77 (1995).

Vitol claims the $10 million debt represents money obtained from Vitol through its reliance on Brass's false representations to Vitol that proceeds of asphalt sales received by GCAC would be remitted directly to Vitol. Vitol claims that Brass had no intention of complying due to GCAC's insolvency and Brass's history of transferring money held in GCAC accounts to himself and his mother. And that Vitol justifiably relied on the false representations. While it is true that GCAC received sales proceeds from the Vitol/GCAC financing arrangement and that Brass transferred millions out of GCAC, there is insufficient evidence that Brass made false representations to warrant nondischargeability of debt.

There is an email where Brass outlines thoughts on the terms of interim financing deals[50] and Kuo's testimony about speaking to Brass about repayment terms.[51] But none of this is firm evidence of Brass making false representations about repayment at the time of the financing deals. It is also unclear whether any such representations would have been made on behalf of GCAC or Brass individually.

---

[50] Vitol Ex. 14.

[51] Sept. 7 Trial Tr., 58:25–59:8.

There are also emails detailing actual financing deals where Vitol purchased product that GCAC could sell to a third party.[52] But those emails show representations between Vitol employees and GCAC employees. Brass is copied on some emails but Patrick Perugini from GCAC is usually the main business contact.[53] And Vitol overlooks that GCAC paid Vitol millions of dollars between July and December 2017, including about $8.9 million in January 2018.[54] Thus, there is insufficient evidence that, at the time of the financing deals, Brass made false representations that he had no intention of making GCAC pay its bills.

## B.    Actual Fraud

Vitol also claims that Brass committed actual fraud under Section 523(a)(2)(A). Vitol seeks to prove actual fraud by establishing several badges of fraud under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"). The obvious issue is that Vitol conducted business with GCAC, not Brass individually, and the proceeds of the Vitol/GCAC financing arrangement were deposited in GCAC's bank account, not Brass's. But in *Husky Int'l Electronics, Inc. v. Ritz (In re Ritz)*, the Supreme Court held that claims like Vitol asserts here are permissible:

> It is of course true that the transferor does not "obtai[n]" debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her participation in the fraud . . . If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).

578 U.S. 356, 365 (2016).

The Supreme Court remanded *Ritz* to the Fifth Circuit. On remand, the Fifth Circuit confirmed that establishing actual fraud under TUFTA may establish fraud under Section 523(a)(2)(A) and that actual fraud may satisfy a veil piercing claim:

> {E]stablishing that a transfer is fraudulent under the actual fraud prong of TUFTA is sufficient to satisfy the actual fraud requirement of veil-piercing because a transfer that is made "with the actual intent to hinder,

---

[52] Vitol Exs. 12, 18, 19–23.

[53] *Id.*

[54] *See, e.g.*, Vitol Ex. 124 at Bates No. Debtor000102 ($8.93 million payment to Vitol in Jan. 2018).

delay, or defraud any creditor," . . . necessarily "involves dishonesty of purpose or intent to deceive."

*Husky Int'l Electronics, Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 567 (5th Cir. 2016) (internal quotation marks and footnote omitted).

The Fifth Circuit also held in *Ritz* that a debt could be nondischargeable under Section 523(a)(2)(A) if actual fraud is established under TUFTA and the actual fraud was for the individual debtor's direct personal benefit. *Id.* at 569. This case resembles the facts in *Ritz* because the individual who allegedly caused and benefitted from the actual fraud filed a bankruptcy case. Thus, under binding precedent, a debt is nondischargeable here if Vitol proves actual fraudulent transfers between GCAC and Brass under TUFTA, and that Brass used these funds for his direct personal benefit.[55]

Direct evidence of actual fraud is often difficult to establish. So TUFTA includes 11 badges of fraud:

1. the transfer was to an insider;
2. the debtor retained possession or control of the property transferred after the transfer;
3. the transfer or obligation was concealed;
4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. the transfer was of substantially all the debtor's assets;
6. the debtor absconded;
7. the debtor removed or concealed assets;
8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).

---

[55] Vitol uses TUFTA to establish a nondischargeable prepetition debt. This is not a TUFTA action seeking to avoid transfers and a return of funds to the GCAC estate. So there is no concern here about whether Vitol is asserting a cause of action held by GCAC's chapter 7 trustee.

Vitol doesn't need to prove all or even a majority of the badges of fraud to succeed. *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008); *see also Roland v. United States,* 838 F.2d 1400, 1402–03 (5th Cir. 1988) (interpreting TUFTA and finding "several" badges to be sufficient to find fraudulent intent).

There are several badges of fraud present here.

First, Brass was the president of GCAC, so he was an insider during the relevant time.[56] Brass also controlled GCAC's spending.[57] The evidence shows that he transferred about $6 million from GCAC between July 2017 and December 2018—the overwhelming majority for his direct personal benefit and also to benefit his mother (another GCAC insider).[58] The transfers were booked on GCAC's books and records as a purported loan to Brass, but even he recognized they could just be amounts credited to him.[59] He appears to have repaid some of these "loans" in the past. From January to May 2017, for example, GCAC's bank statements show a pattern of Brass transferring funds into his personal account, but later transferring funds back into GCAC's account:[60]

But when GCAC started receiving funds from the financing arrangement around August 2017, Brass sped up the rate of transfers from GCAC to his personal account for his personal benefit. He even caused GCAC to transfer money to his mother. These transfers occurred on a weekly, sometimes even daily, basis.[61] And, at the same time, he essentially stopped repaying GCAC.

Brass had about $1,800 in his personal bank account then, so the transfers definitely helped him continue a very good lifestyle.[62] Sometimes Brass transferred cash around the same time large sums of money from Vitol/GCAC financing deals were deposited into GCAC's bank account. For example, one week after GCAC received over $1.5 million from a deal in August 2017, Brass transferred $582,737.02 from GCAC's bank account to a company contracted to build his second

---

[56] Sept. 16 Trial Tr., 176:2–8.

[57] *Id.*, 183:19–185:10.

[58] Brass's transfers may also properly be considered in the aggregate as part of a scheme to divest GCAC of property.

[59] Sept. 16 Trial Tr., 198:14–199:9; 199:16–18 ("GCAC is controlled by me. Sometimes GCAC would collect money back from due-to and due-from accounts. Sometimes it wouldn't. That's all I can tell you").

[60] Vitol Ex. 124, at Bates Nos. Debtor000005–Debtor000035.

[61] *See, e.g.*, *id.*, at Bates Nos. Debtor000068–Debtor000089.

[62] Vitol Ex. 75, at Bates No. IBC_0002044 (Brass's personal account balance as of August 3, 2017).

home in a prestigious Houston area neighborhood.[63] Then, in December 2017, the same day GCAC received over $2 million from another Vitol related deal, Brass transferred $675,000 to his personal account.[64] Brass's personal bank records show that on the same day, Brass wrote a check to a well-known fine jewelry retailer for about $665,000.[65]

Starting around February 2018, when it became clear the business relationship between the parties ended (and Vitol was repeatedly asking about a final payment from GCAC), Brass consistently caused GCAC to transfer cash to him—and sometimes his mother—at an alarming rate. GCAC's June 2017 balance sheet shows a "due from" shareholder loan balance of $86,696.[66] Between July 1, 2017 and December 31, 2017, that amount increased to $2,998,569.[67] From January 1, 2018 to December 2018, it skyrocketed to $6,246,338.[68] Thus, Brass transferred over $6 million out of GCAC in just 1.5 years. There is no evidence of Brass repaying GCAC even 1% of these amounts withdrawn.

Second, the transfers were for substantially all of GCAC's assets. As explained in the insolvency discussion below, Brass's transfer campaign against GCAC left the company with virtually no cash, undercapitalized, and unable to pay its bills in the ordinary course of business.

Third, transfers were made while litigation was pending against GCAC and Brass. Brass and GCAC were sued in state court by Superior Crude Gathering, Inc. in February 2017 for, among other things, fraud related to nonpayment of about $1.8 million.[69] And in May 2018, Vitol countersued Brass and GCAC in state court for fraud.[70]

Fourth, GCAC did not receive reasonable consideration for the millions transferred to Brass.

---

[63] Vitol Ex. 124, at Bates Nos. Debtor000051 and Debtor000054; Sept. 16 Trial Tr., 224:11–226:7.

[64] Vitol Ex. 124, at Bates Nos. Debtor000084 and Debtor000089.

[65] Vitol Ex. 75, at Bates No. IBC_0000061.

[66] Vitol Ex. 81-174, at 7.

[67] *Id.*, at 8.

[68] Vitol Ex. 81-181.

[69] Vitol Ex. 83.

[70] Vitol Ex. 86.

And finally, GCAC was insolvent at the time of the transfers and soon after. By December 2017, GCAC had negative $10 million income and continued to have negative income through 2018.[71] And GCAC's 2017 and 2018 balance sheets showed an approximately $14.9 million outstanding contingent liability owed to Vitol.[72] Vitol's expert Gene Deetz analyzed GCAC's solvency as of June 30, 2017, as of December 31, 2017, and as of January 2018.[73] He performed a solvency analysis using three tests: the balance sheet test, the capital adequacy test, and the cash flow test.[74] Deetz's testimony and conclusions about GCAC's solvency were very thoughtful, detailed, and credible. He provided convincing evidence that GCAC was insolvent on all three target dates.[75]

The balance sheet test examines whether a company's assets at a full and fair valuation exceeds the company's liabilities.[76] Deetz provided convincing evidence that GCAC was balance sheet insolvent on the target dates. GCAC's books and records showed equity in 2017 and 2018.[77] The book equity included about $6.6 million for investments or loans in three affiliated entities: GCAC Holdings, Gulf Coast Crude, and AG Bullet.[78] But between January and December 2017 these entities had little to no assets, no revenues, and negative income before taxes.[79] Thus, Deetz concluded that these amounts should be written off, making GCAC insolvent. The Court also agrees with Deetz's additional adjustments further deepening GCAC's insolvency.

Deetz also provided convincing evidence that GCAC was inadequately capitalized. The capital adequacy test analyzes a company's cushion to address the normal ebbs and flows of a business through a normal cycle.[80] He demonstrated that GCAC operated with negative working capital. Thus, GCAC was forced to use

---

[71] Vitol Exs. 81-175, at 14; 81-190, at 2.

[72] Vitol Exs. 81-174, at 8; 81-181.

[73] Sept. 28 Trial Tr., Adv. No. 21-06006, Docket No. 200, 57:3–8.

[74] *Id.*, 55:11-23. The capital adequacy test and the cash flow test are also used in constructive fraudulent transfer actions under TUFTA.

[75] Deetz also provided convincing testimony that GCAC was insolvent on a consolidated basis with other GCAC non-debtor related entities.

[76] Sept. 28 Trial Tr., 56:1–10.

[77] Vitol Exs. 81-174; 81-181; Sept. 28 Trial Tr., 77:1–5.

[78] Sept. 28 Trial Tr., 71:4–16.

[79] *Id.,* 71:4–77:18; 83:7–14.

[80] *Id.,* 56:13–15.

the sale proceeds of the Vitol/GCAC financing arrangement for capital.[81] But, as discussed above, Brass was transferring millions from GCAC to himself. GCAC was inadequately capitalized even booking Brass's transfers as loans on the books.

GCAC also failed the cash flow test, meaning that it could not pay its debts as they matured.[82] While GCAC received millions between August and December 2017 from the sales proceeds of the Vitol/GCAC financing arrangement, Brass was causing GCAC to transfer millions to himself. GCAC did not have another source of income to offset Brass's transfers.[83]

Thus, there is sufficient evidence that Brass committed actual fraud under Section 523(a)(2)(A).

## Section 523(a)(6)

Section 523(a)(6) disallows dischargeability of a debt "for willful and malicious injury by the debtor to another entity." This section generally relates to intentional torts. Thus, there must be "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

A willful and malicious injury requires a showing of either: (1) an objective substantial certainty of injury or (2) a subjective motive to cause harm on the part of the debtor. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998). "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be nondischargeable do so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'" *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x. 360, 361–62 (5th Cir. 2007). And besides satisfying one prong under this test, the Fifth Circuit has also held that the injury must "not be sufficiently justified under the circumstances to render it not 'willful and malicious.'" *Id.*

In *Ritz*, the Supreme Court stated that "[T]he debtors who commit fraudulent conveyances *and* the debtors who make false representations under § 523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under § 523(a)(6). There is, in short, overlap, but that overlap appears inevitable." *Ritz*, 578 U.S. at 363. That is the case here.

---

[81] *Id.*, 83:18–84:1; 89:13–19; 90:4–9.

[82] *Id.*, 90:10–17.

[83] *See id.*, 91:1–21.

This Court incorporates its findings in the Section 523(a)(2)(A) actual fraud section here. Around the time Brass learned that Vitol would not finalize a joint venture with GCAC, he transferred over $6 million of sales proceeds from the Vitol/GCAC financing arrangement for his personal benefit and an additional $1 million in 2019 while the parties were litigating in state court.[84] Text messages between Kuo and Brass confirm that Brass knew Vitol was owed significant funds.[85] Brass also admitted in trial that the transferred funds could have been used to repay Vitol.[86]

Brass had little to no cash when the financing arrangement started in July/August 2017. And when it was clear Vitol was no longer financing GCAC deals—thus ending his personal source of cash to spend on second homes and other lavish items—Brass stopped repaying Vitol but kept siphoning cash from GCAC. Brass was the president of GCAC and controlled its spending. Brass knew that the joint venture discussions and the financing arrangement were over, which meant there would be no additional financing for Vitol to fund his desired lifestyle through GCAC. Yet he continued to cause GCAC to move funds from its account to his personal account anyway.

The Court finds that Brass's actions amount to more than recklessness or bad management. Brass's actions were substantially certain to harm Vitol. And these actions were not sufficiently justifiable under the circumstances to render it not willful and malicious. In fact, the evidentiary record revealed Brass's actions were not justified at all. Thus, Brass caused a willful and malicious injury to Vitol under Section 523(a)(6).

**Section 523(a)(4)**

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." This Court granted summary judgment for Brass on Vitol's nondischargeability claim based on fraud while acting in a fiduciary capacity.[87] So Vitol's remaining potential claim under

---

[84] Vitol Ex. 124, at Bates Nos. Debtor000419, Debtor000423, Debtor000198–Debtor000200, Debtor000207–Debtor000212, Debtor000215–219, and Debtor000223.

[85] *See* Brass Ex. 23, at 44–60.

[86] *See, e.g.*, Sept. 22 Trial Tr., 56:5–8.

"Q: Sure. If that $6.2 million hadn't been distributed to GCAC's shareholders, it could have been used by GCAC for other business purposes, right?

A: I guess that's true."

[87] *See* Summ. J. Order.

Section 523(a)(4) is embezzlement. Embezzlement for the purpose of Section 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller*, 156 F.3d at 602 (citations omitted); *NextGear Cap., Inc. v. Rifai (In re Rifai)*, 604 B.R. 277, 325 (Bankr. S.D. Tex. 2019).

Vitol argues that the debt is nondischargeable under Section 523(a)(4) because it arose from Brass's embezzlement of funds entrusted to his care. According to Vitol, cash proceeds GCAC received from the financing deals were earmarked for Vitol. Therefore, Brass embezzled these funds when he transferred them to his personal account rather than remit them to Vitol.

There is no embezzlement here because the financing deals were set between Vitol and GCAC employees.[88] And cash proceeds derived from the deals were deposited into GCAC's account, not Brass's.[89] Thus, they were entrusted to GCAC. There is a difference between entrusting property to the care of a company and entrusting property to the president of that company in his individual capacity. *See Rifai*, 604 B.R. at 326 (no embezzlement when funds and assets entrusted to debtor's company and not the debtor). Thus, there is no embezzlement claim here.

## Damages

Vitol claims that the $10 million debt is nondischargeable. Vitol argues that GCAC's consolidated financials in December 2017 and 2018 listed an approximately $14.9 million debt owed to Vitol. And GCAC's tax returns listed that debt too. Kuo testified GCAC owed Vitol about $15 million, consisting of around $3.5 million for unpaid product, between $5-$8 million for hedging losses, and the rest for related costs.[90] Brass counters that GCAC and Vitol never finally reconciled debts. He also tried to argue that he understood the Settlement Agreement required him to repay Vitol if he could.[91]

---

[88] *See* Vitol Exs. 12, 18, 19–23.

[89] *See* Vitol Ex. 124 (GCAC bank statements).

[90] Sept. 16 Trial Tr., 157:16–19; 160:17–165:4.

[91] Sept. 16 Trial Tr., 232:3–17. Brass was not credible about repayment of the Settlement Agreement or his lack of knowledge about basic information on GCAC financials.

The best measure of damages come from the financing deals. GCAC's financial statements and bank statements support product sales debt. GCAC's Consolidated Income Statement for the 12 months ending December 31, 2017 lists $22,200,697 in sales.[92] GCAC made five payments to Vitol or for its benefit totaling $18,431,603.48.[93] Subtracting GCAC's payments from cost of sales equals $3,769,093.52.

Vitol also seeks nondischargeability of debt related to hedging losses, as well as storage, transportation, and related expenses. There are emails confirming that GCAC and Brass knew Vitol was hedging deals, but there is no firm evidence about who pays for losses on hedges. Vitol chose the type of hedge and the terms of the hedge.[94] And there is not enough evidence about how Vitol calculated hedging losses. There is also a lack of firm evidence about the calculation of transportation and related expenses. These debts were covered by Vitol and therefore differ from sale proceeds Brass transferred to himself.

Thus, $3,769,093.52 is the nondischargeable debt owed to Vitol.

**Attorney's Fees**

Under the "American Rule," each party pays its own attorney's fees arising out of litigation absent specific authority granted under a statute or a fee shifting provision in a contract. *See Alyeska Pipeline Serv. Co. v. Wilderness* Soc'y, 421 U.S. 240, 247 (1975). The Bankruptcy Code does not provide creditors a claim for attorneys' fees in nondischargeability cases. But the Fifth Circuit has held that creditors may recover attorney's fees if there is a contractual or statutory right to fees. *Jordan v. Southwest Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226–27 (5th Cir. 1991) (overruled on other grounds); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1285–86 (5th Cir. 1992).

Vitol is not entitled to attorney's fees here. There is no contract or other evidence of a fee-shifting arrangement about attorney's fees. There is also no statutory right. Vitol prevailed on a Section 523(a)(2)(A) claim by establishing actual fraud using TUFTA badges of fraud as permitted under the Supreme Court and Fifth Circuit *Husky* decisions. But using TUFTA factors to establish actual fraud does not transform Vitol's nondischargeability action into a full-blown TUFTA action. Just like Vitol may not seek avoidance or other remedies under separate

---

[92] Vitol Ex. 81-175, at 13.

[93] Vitol Ex. 124, at Bates Nos. Debtor000060 ($1,690,065.00), Debtor000066 ($107,137.23), Debtor000078 ($4,000,000.00), Debtor000088 ($3,700,000.00), and Debtor000102 ($8,934,401.25).

[94] Sept. 16 Trial Tr., 113:14–21.

TUFTA sections, Vitol is also not entitled to seek attorney's fees under it either. This case is about the determination of a nondischargeable debt only.

Thus, for the reasons stated above, it is:

**ORDERED** that the debt owed by Brass to Vitol for $3,769,093.52 is nondischargeable under Section 523(a)(2)(A) and Section 523(a)(6) of the Bankruptcy Code. No additional award to Vitol for attorney's fees or pre- or post-judgment interest.

Signed:  December 21, 2022

Christopher Lopez
United States Bankruptcy Judge

17